UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                              :

UNITED STATES OF AMERICA,        :

                              :

         - v. -            :                **S1 20 Cr. 603 (PKC)**

                              :

NICHOLAS JOSEPH,           :
    a/k/a "Gotti,"          :
    a/k/a "Finesse,"       :

                              :

               Defendant.    :
------------------------------------------------------x

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

                     AUDREY STRAUSS
                     United States Attorney for the
                     Southern District of New York
                     One St. Andrew's Plaza
                     New York, NY 10007

Andrew K. Chan
Emily A. Johnson
Celia V. Cohen
Assistant United States Attorneys
      *- Of Counsel -*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ....................................................................................................................... 1

ARGUMENT ............................................................................................................................ 7

I.   PRESENT SENSE IMPRESSIONS AND EXCITED UTTERANCES SHOULD BE
     ADMITTED ....................................................................................................................... 7

     A.   Relevant Facts ................................................................................................................ 7
     B.   Applicable Law ............................................................................................................ 10
     C.   Discussion .................................................................................................................... 12

II.  STATEMENTS BY THE DEFENDANT TO A COOPERATING WITNESS WHILE
     IN CUSTODY SHOULD BE ADMITTED ..................................................................... 13

III. RAP VIDEOS AND LYRICS BY THE DEFENDANT RELATING TO THE
     CHARGED CRIMES SHOULD BE ADMITTED .......................................................... 16

     A.   Facts ............................................................................................................................. 16
     B.   Applicable Law ............................................................................................................ 17
     C.   Discussion .................................................................................................................... 20

IV.  THE COURT SHOULD ADMIT LIMITED TESTIMONY REGARDING THE
     DEFENDANT'S SUPERVISION ON PAROLE IN JULY 2020 .................................... 22

V.   THE COURT SHOULD PRECLUDE CROSS-EXAMINATION OF LAW
     ENFORCEMENT WITNESSES REGARDING UNRELATED ALLEGATIONS OF
     PROFESSIONAL MISCONDUCT .................................................................................. 26

     B.   Discussion .................................................................................................................... 30

CONCLUSION ....................................................................................................................... 32

## TABLE OF AUTHORITIES

Cases

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) .................................................................. 27
*Dicks v. United States*, 2010 WL 11484356 (E.D. Pa. Sept. 8, 2010) ........................................ 30
*Estate of Guidry v. Lowe's Home Centers*, 2019 WL 137607, at *4 (S.D. Miss. Jan. 8, 2019)... 11
*Hilyer v. Howat Concrete Co.*, 578 F.2d 422, 426 n.7 (D.C. Cir. 1978) ....................................... 11
*Miller v. Crown Amusements, Inc.*, 821 F. Supp. 703, 706 (S.D. Ga. 1993) ............................... 11
*Phillips v. City of New York*, 871 F. Supp. 2d 200 (E.D.N.Y. 2012) ........................................... 29
*Saldarriaga v. United States*, No. 99 Civ. 4487 (WK), 2002 WL 449651 (S.D.N.Y. Mar. 21, 2002) ............................................................................................................................... 29
*United States v. Belfast*, 611 F.3d 783 (11th Cir. 2010) ............................................................. 18
*United States v. Blakey*, 607 F.2d 779, 786 (7th Cir. 1979) ....................................................... 10
*United States v. Brown*, 2017 WL 2493140 (S.D.N.Y. June 9, 2017) ......................................... 18
*United States v. Brown*, 77 M.J. 638, 651-52 (C.A.A.F. 2018) .................................................. 11
*United States v. Cain*, 587 F.2d 678, 681 (5th Cir. 1979) ......................................................... 11
*United States v. Caracappa*, 614 F.3d 30 (2d Cir. 2010) ........................................................... 27
*United States v. Devery*, 935 F. Supp. 393 (S.D.N.Y. 1996) ...................................................... 28
*United States v. Figueroa*, 548 F.3d 222 (2d Cir. 2008) ........................................................... 27
*United States v. Graham*, 293 F. Supp. 3d 732 (E.D. Mich. 2017) ...................................... 20, 21
*United States v. Hawkins*, 59 F.3d 723, 730 (8th Cir. 1995) ..................................................... 11
*United States v. Herron*, 2014 WL 1871090 (E.D.N.Y. May 8, 2014) ....................................... 21
*United States v. Ibanez*, 328 F. App'x 673, 675 (2d Cir. 2009) ................................................. 10
*United States v. Jackson*, 124 F.3d 607, 618 (4th Cir. 1997) .................................................... 11
*United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002) ......................................................... 10
*United States v. Lights*, 2016 WL 7098633 (S.D.N.Y. Dec. 5, 2016) ......................................... 28
*United States v. Medico*, 557 F.2d 309, 313 (2d Cir. 1977) ....................................................... 11
*United States v. Mejia-Valez*, 855 F. Supp. 607, 614 (E.D.N.Y. 1994) ...................................... 10
*United States v. Moore*, 639 F.3d 443 (8th Cir. 2011) ............................................................... 18
*United States v. Nelson*, 2011 WL 2207584 (S.D.N.Y. June 3, 2011) ........................................ 29
*United States v. Obayagbona*, 627 F. Supp. 329, 340 (E.D.N.Y. 1985) ..................................... 11
*United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015) ....................................................... 17, 18, 19
*United States v. Pitre*, 960 F.2d 1112 (2d Cir .1992) ................................................................ 22
*United States v. Polanco*, 2011 WL 1795293 (S.D.N.Y. May 3, 2011) ...................................... 28
*United States v. Smith*, 2007 WL 188734 (S.D.N.Y. Jan. 24, 2007) .......................................... 29
*United States v. Steele*, 216 F. Supp. 3d 317, 322 (S.D.N.Y. 2016) .......................................... 11
*United States v. Stuckey*, 253 F. App'x 468 (6th Cir. 2007) ...................................................... 21

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law to request rulings on several evidentiary issues in advance of the trial of Defendant Nicholas Joseph, currently scheduled to commence on September 7, 2021.  Specifically, the Government seeks rulings:

(1) Admitting as present sense impressions and excited utterances 911 calls and statements made to a cooperating witness ("CW-1") in the moments immediately after the shooting in the Story Playground on April 28, 2017 charged in Counts Two and Three of the Indictment;

(2) Admitting statements that the defendant made to CW-1 at the Essex County Jail on or about June 21, 2021;

(3) Admitting rap videos and lyrics of the defendant, in which the defendant describes his involvement in the crimes charged in the Indictment;

(4) Admitting evidence that the defendant was on parole at the time he was arrested in possession of a firearm on July 10, 2020; and

(5) Precluding cross-examination of law enforcement witnesses regarding unrelated allegations of prior misconduct.

## BACKGROUND

### A.  The Castle Hill Crew (Count One)

Defendant Nicholas Joseph is charged in the S1 Superseding Indictment (the "Indictment") with various crimes relating to his participation in a gang based in the Castle Hill Houses in the Soundview neighborhood of the Bronx (the "Castle Hill Crew" or the "670 Coke Boys").  Between in or around 2014 and in or around 2020, the defendant and other members and associates of the Castle Hill Crew committed a variety of different crimes, including narcotics trafficking, bank fraud, assaults, and shootings.  Members of the Castle Hill Crew frequently congregated in the vicinity of a convenience store located at 670 Castle Hill Avenue and bragged about crimes committed by the gang on social media and in rap videos posted on the Internet.

During the period charged in the Indictment, the Castle Hill Crew was embroiled in a violent back-and-forth conflict with members of a rival gang based in the nearby James Monroe Houses (the "Monroe Houses Crew"). For example, below are some of the acts of violence between the rival gangs that will likely be discussed at trial, among many others:

- On or about September 25, 2014, members and associates of the Castle Hill Crew fired multiple shots at members of the Monroe Houses Crew in the vicinity of the Monroe Houses;

- On or about June 21, 2015, the defendant and another member of the Castle Hill Crew were shot in the vicinity of the Castle Hill Houses;

- On or about November 19, 2015, the defendant and other members of the Castle Hill Crew assaulted and stabbed a member of the Monroe Houses Crew in the vicinity of Lafayette Avenue between Thieriot Avenue and Taylor Avenue.;

- In or around the Summer of 2016, members of the Castle Hill Crew and members of the Monroe Houses Crew engaged in a gang melee, during which a member of the Castle Hill Crew slashed a member of the Monroe Houses Crew;

- On or about April 27, 2017, members of the Monroe Houses Crew fired shots at the defendant in the vicinity of the Monroe Houses;

- On or about April 28, 2017, the defendant fired shots at a member of the Monroe Houses Crew in the vicinity of the Story Playground, resulting in a twelve-year old child being shot and injured, as charged in Counts Two and Three of the Indictment;

- On or about June 8, 2017, members of the Monroe Houses Crew fired shots at members of the Castle Hill Crew in the vicinity of Soundview Avenue and Randall Avenue in the Bronx; and

- On or about September 14, 2019, members of the Monroe Houses Crew assaulted and slashed a member of the Castle Hill Crew in the vicinity of 670 Castle Hill Avenue.

Count One of the Indictment charges the defendant with participating in a racketeering conspiracy relating to the Castle Hill Crew, in violation of Title 18, United States Code, Section 1962(d). At trial, the Government intends to prove the defendant's involvement in the Castle Hill Crew through, among other things, testimony from cooperating witnesses, text messages and private social media messages that the defendant exchanged with other members of the Castle

Hill Crew, images and videos from the defendant's cellphone and social media accounts, rap videos in which the defendant discusses his membership in the Castle Hill Crew and describes the Castle Hill Crew's involvement in racketeering activity, and photographs and videos of the defendant with other members of the Castle Hill Crew.

**B.  The Story Playground Shooting on April 28, 2017 (Counts Two and Three)**

One of the acts of violence committed by the defendant as part of his membership in the Castle Hill Crew was a shooting in the Story Playground in the Bronx on April 28, 2017 (the "Story Playground Shooting"), which resulted in a 12-year old child in the playground being shot.  On April 27, 2017—the day before the Story Playground Shooting—several members of the Monroe Houses fired shots at the defendant.   The next day—on April 28, 2017 at approximately 5:15 p.m.—a member of the Monroe Houses Crew was present in the Story Playground, which is located on Story Avenue between Taylor Avenue and Theriot Avenue in the Soundview neighborhood.  Meanwhile, the defendant and other members of the Castle Hill Crew were in the lobby of 820 Thieriot Avenue, which is located across the street from the Story Playground.  When the defendant and other members of the Castle Hill Crew saw the rival gang member from the Monroe Houses Crew in the Story Playground, the defendant exited the lobby of 820 Thieriot Avenue, pulled out a gun, and fired multiple shots at the rival gang member.  The defendant's shots missed the rival gang member but hit a twelve-year old child from the Monroe Houses who was playing basketball in the Story Playground.  The defendant then fled the scene. A map of the relevant area surrounding the Story Playground and 820 Thieriot Avenue is depicted below:



Count Two of the Indictment charges the defendant with assault with a dangerous weapon and attempted murder in aid of racketeering, in violation of Title 18, United States Code, Sections 1959 and 2, relating to the defendant's participation in the Story Playground Shooting. Count Three of the Indictment charges the defendant with using and carrying a firearm during and in furtherance of a crime of violence, which was discharged, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i), (ii), (iii), and 2, relating to the defendant's discharge of a firearm during the Story Playground Shooting.

At trial, the Government intends to prove the defendant's participation in the Story Playground Shooting with, among other things: (1) evidence from CW-1, who was a member of the Monroe Houses Crew that was present when shots were fired at the defendant on April 27, 2017 and heard present sense impressions and excited utterances from other members of the Monroe Houses Crew about the Story Playground Shooting on April 28, 2017 immediately after the shots were fired; (2) surveillance video showing the defendant and other members of the

4

Castle Hill Crew waiting in the lobby of 820 Thieriot Avenue before the shooting, as well as the defendant running towards the Story Playground with a gun in the seconds leading up to the shooting; (3) evidence from ShotSpotter records indicating that shots were fired in the vicinity of the Monroe Houses at approximately 11:40 a.m. on April 27, 2017—the day before the Story Playground Shooting, and shots in the vicinity of 820 Thieriot Avenue—where the defendant was depicted in possession of a gun on surveillance video moments before the shooting—at approximately 5:09 p.m. on April 28, 2017; (4) 911 calls about the date, time, and location of the shooting; (5) testimony from law enforcement officers and witnesses who were present at the scene of the shooting; and (6) evidence from a cellphone seized from Nicholas Joseph in December 2020 containing multiple Internet searches relating to the Story Playground Shooting.

### C.  The Gun Arrest on July 10, 2020 (Count Four)

Early in the morning on July 10, 2020, the defendant's New York State Department of Corrections and Community Supervision ("NYSDOCCS") parole officer, accompanied by other NYSDOCCS parole officers and NYPD officers, conducted a home visit to verify that the defendant was in compliance with his 8pm to 8am curfew.  The defendant was not at home, in violation of his parole conditions.  After conducting several other home visits in the Soundview neighborhood, the parole officer observed the defendant walking across a street while wearing a black fanny pack at approximately 7:10 a.m.  The defendant walked into the convenience store at 670 Castle Hill Avenue.  The parole officer arrested the defendant and, upon doing so, observed a loaded firearm inside of the defendant's fanny pack.  A search incident to arrest also revealed that the defendant was in possession of, among other things, several debit cards in the names of other individuals and two pills that tested positive for the presence of oxycodone.  Count Four of

the Indictment charges the defendant with being a felon in possession of a firearm and ammunition, in violation of Title 18, United States Code, Section 922(g), relating to this arrest.

### D.  The Gun Arrest on December 10, 2020 (Count Five)

From approximately November 2020 through December 2020, the defendant took various photos and videos of himself in possession of a silver firearm with a white handle, some of which he posted to social media.

On November 12, 2020, a grand jury sitting in the Southern District of New York returned an indictment charging the defendant, and an arrest warrant for the defendant was issued.  On December 10, 2020, NYPD police officers saw the defendant and Malik James, an associate of the Castle Hill Crew, in the vicinity of 2086 Bruckner Boulevard.  The officers arrested the defendant, but James fled from the officers before being stopped.  Having seen the defendant's social media posts of the gun, and having received information that the defendant was in possession of a gun, the officers then began looking for one.  They found a loaded gun in a nearby ditch that matched the appearance of the gun in the defendant's social media posts.

Following the defendant's arrest, law enforcement obtained a court-authorized search warrant for the defendant's cellphone, which contained additional videos in which the defendant is brandishing the same firearm, as well as text messages from the night of the arrest indicating that the defendant was in possession of a firearm for the purpose of committing a potential armed robbery.  Count Five of the Indictment charges the defendant with being a felon in possession of a firearm and ammunition, in violation of Title 18, United States Code, Section 922(g), relating to his possession of this firearm and ammunition in or around December 2020.

## ARGUMENT

### I.    Present Sense Impressions and Excited Utterances Should Be Admitted

#### A.    Relevant Facts

At trial, the Government intends to offer present sense impressions and excited utterances relating to the Story Playground Shooting from: (1) two 911 call recordings ("911 Call #1" and "911 Call #2"); and (2) statements made to CW-1 by other members of the Monroe Houses Crew immediately following the Story Playground Shooting who saw the defendant fire a gun.

A transcript of 911 Call #1 follows:

**911 OPERATOR:**    911, where is your emergency?

**911 CALLER:**    Yes, on Taylor Avenue between Lafayette and Story Avenue. Somebody just got their head blown off right in front of PS 101

**911 OPERATOR:**    [UI]

**911 CALLER:**    Between- Taylor Avenue between Lafayette and Story Avenue in the Bronx

**911 OPERATOR:**    Okay-

**911 CALLER:**    Right in front of PS uh, I believe 100. Send a police car please.

**911 OPERATOR:**    Ma'am ma'am, I'm just gonna verify. You said Taylor Avenue by Lafayette?

**911 CALLER:**    Yes, Taylor Avenue between Lafayette and Story Avenue.

**911 OPERATOR:**    Okay, between Story Avenue and Lafayette Avenue. And you said someone that was shot in the head?

**911 CALLER:**    I- there has been 6 shots. Someone has just been shot. Everybody's running. The kids from the playground, um you have to send somebody now.

**911 OPERATOR:**    Yes ma'am, help is on its way. I just have a few more questions. Did you see the person who shot the person?

**911 CALLER:**    Yeah, but you know what? You're asking too many-

**911 OPERATOR:**     Ma'am, who is the description of the person who did this?

**911 CALLER:**     No, I'm watching it from the window. I'm on the 15th floor. I heard the shots.

**911 OPERATOR:**     Okay, but ma'am I'm just asking you a simple question. If you don't know what- who shot the person, it's okay.

**911 CALLER:**     No, I can't see it from up here because-

**911 OPERATOR:**     Okay. Ma'am, how many shots did you hear?

**911 CALLER:**     I heard 6 shots.

**911 OPERATOR:**     6 shots? Okay, ma'am help is on the way, I'm just going to ask you a few more-

A transcript of 911 Call #2 follows:

**911 OPERATOR**:     911, where is the emergency?

**911 CALLER:**     Well I just, I live across the street in a private house. I just heard some gunshots in the park across the street.

**911 OPERATOR:**     Okay where? Where? What two streets is that between-

**911 CALLER:**     Uh, well uh, it's on Story Avenue between Thieriot and Taylor.

**911 OPERATOR:**     Okay.

**911 CALLER:**     I see a lot of cops, I guess you already know already.

**911 OPERATOR:**     Story Avenue and Taylor and Thieriot?

**911 CALLER:**     Yeah.

**911 OPERATOR:**     How many shots did you hear?

**911 CALLER:**     Uh, I don't know. I just got inside real quick. It was like 3, maybe 3 or 4. There's a lot of cops here. I guess you already know already. I just wanna let you know.

**911 OPERATOR:**     Okay, you said you heard about 4 shots, correct?

**911 CALLER:**     3 or 4. I didn't really count. I'm trynna get inside. The whole park just cleared out.

**911 OPERATOR:**    Okay, did you see- did you see who fired the shots? Or is anybody in there-

**911 CALLER:**    No, no, cause I was on my porch. I wasn't looking over at the park, but I'm saying it's- when I saw everybody running at the park, I assumed it was inside the park.

**911 OPERATOR:**    Okay, and you don't know of anybody's injured, correct?

**911 CALLER:**    No, but I'm saying it's- you should know that cause all the cops are here now. There's a whole lotta cops here and a ambulance

**911 OPERATOR:**    Okay sir, I do have to verify the information that you called to give me.

**911 CALLER:**    Alright, all I want noted- all I wanna do is let you know that I heard shots. That's about it.

**911 OPERATOR:**    Okay, that's no problem. Can I have your last name?

**911 CALLER:**    No, I don't wanna give my name.

**911 OPERATOR:**    Okay, you wanna be anonymous? No problem. I'm operator 1900.

**911 CALLER:**    Alright, bye bye.

**911 OPERATOR:**    Assistance will be there as soon as possible.

The Government also anticipates calling CW-1, who will testify about being present with other members of the Monroe Houses Crew on June 27, 2017—the day before the Story Playground Shooting.  CW-1 will testify about how members of the Monroe Houses Crew saw the defendant in the vicinity of the Monroe Houses and then decided to shoot at the defendant. CW-1 provided a gun to Monroe Houses Crew member Nasir Vincent, and CW-1 then heard the shots seconds later.  After Vincent fired at the defendant, CW-1 and another member of the Monroe Houses Crew chased after the defendant, attempting to shoot him.  The next day, CW-1 was present in the vicinity of the Monroe Houses when he saw Vincent and another member of the Monroe Houses Crew named Latief Jenkins walking toward the Story Playground.  CW-1

9

then heard gunshots coming from the direction of the Story Playground, and saw Vincent and Jenkins run back from the direction of the playground just seconds after the shots were fired. Jenkins immediately told CW-1 and others that the defendant had fired shots at them in the playground, and also provided a description of what the defendant had been wearing when he fired the shots.

### B.   Applicable Law

#### 1.   Present Sense Impressions

Federal Rule of Evidence 803(1) defines a present sense impression as a "statement describing or explaining an event or condition made while or immediately after the declarant perceived it."   Present sense impressions are "considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002). "For statements to qualify as present sense impressions, precise contemporaneity is not required." *United States v. Ibanez*, 328 F. App'x 673, 675 (2d Cir. 2009); *see also* Fed. R. Evid. 803(1) advisory committee's note (1972) ("With respect to the time element, [803(1)] recognizes that in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable.").

Although there is no bright-line rule delineating when a statement is no longer made "immediately after" an event for purposes of Rule 803(1), courts have generally found that present sense impressions provided within 15 minutes of witnessing a particular event will satisfy this requirement. *See United States v. Mejia-Valez*, 855 F. Supp. 607, 614 (E.D.N.Y. 1994) (admitting description approximately 16 minutes after events); *United States v. Blakey*, 607 F.2d 779, 786 (7th Cir. 1979) (admitting description made between several minutes and 23

minutes after events); *United States v. Jackson*, 124 F.3d 607, 618 (4th Cir. 1997) (statement by witness to police upon their arrival at the scene was admissible as "description of ongoing events"); *United States v. Hawkins*, 59 F.3d 723, 730 (8th Cir. 1995) (admitting 911 phone call placed approximately 7 minutes after incident); *United States v. Obayagbona*, 627 F. Supp. 329, 340 (E.D.N.Y. 1985) (admitting descriptions of events that took place between 2.5 minutes and 15 minutes of events); *Miller v. Crown Amusements, Inc.*, 821 F. Supp. 703, 706 (S.D. Ga. 1993) (finding that 911 call placed less than 10 minutes after incident satisfied Rule 803(1)); *Estate of Guidry v. Lowe's Home Centers*, 2019 WL 137607, at *4 (S.D. Miss. Jan. 8, 2019) ("The Fifth Circuit has found statements made within 15 minutes of an incident to be sufficiently contemporaneous to qualify for the present sense impression to the hearsay rule." (citing *United States v. Cain*, 587 F.2d 678, 681 (5th Cir. 1979)); *see also United States v. Medico*, 557 F.2d 309, 313 (2d Cir. 1977) (finding that description made approximately 5 minutes after events met the requirements of Rule 803(1), but affirming District Court's admission of statement under residual exception); *Hilyer v. Howat Concrete Co.*, 578 F.2d 422, 426 n.7 (D.C. Cir. 1978) (suggesting in dicta that a statement made more than 15 minutes after an event is not admissible); *United States v. Brown*, 77 M.J. 638, 651-52 (C.A.A.F. 2018) (holding generally that five minutes will usually be within the present sense impression exception and twenty minutes is at the "outer edge" of the exception).  "Even where a longer time has passed between the events and the statement describing them, admission under Rule 803(1) can be 'buttressed by the intrinsic reliability of the statements.'"  *United States v. Steele*, 216 F. Supp. 3d 317, 322 (S.D.N.Y. 2016) (quoting *United States v. Parker*, 936 F.2d 950, 954 (7th Cir. 1991)).

###### 2.    Excited Utterances

An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Fed. R. Evid. 803(2).  The rationale for the hearsay exception for excited utterances is that the "excitement of the event limits the declarant's capacity to fabricate and statement and thereby offers some guarantee of its reliability."  *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002) (quoting *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998)).  Unlike present sense impressions, "an excited utterance need not be contemporaneous with the startling event to be admissible."  *United States v. Fell*, 531 F.3d 197, 231 (2d Cir. 2008) (internal citations omitted).  "Rather, the key question governing admission is whether the declarant was, within the meaning of Rule 803(2), under the stress of excitement caused by the event or condition."  *Id.* (internal citations omitted).

#### C.    Discussion

Applying the principles set forth above, the 911 calls and CW-1's testimony about what witnesses to the shooting told him in the immediate aftermath of the incident are admissible as both present sense impressions and excited utterances.  Courts have routinely admitted similar statements made in the immediate aftermath of shootings.  *See United States v. Shipp*, 2020 WL 1140474, at *3 (E.D.N.Y. Mar. 9, 2020) (statements made by victim who placed 911 call shortly after being shot); *United States v. Steele*, 216 F. Supp. 3d 317, 322-23 (S.D.N.Y. 2016) (statements by 911 caller about observing man in a jacket pointing a gun at another man and then hearing a gunshot); *United States v. Scott*, 2014 WL 6765960, at *1 (S.D.N.Y. Nov. 28, 2014) (statements made by victim who placed 911 call shortly after being menaced with a firearm); *United States v. Mejia-Valez*, 855 F. Supp. 607, 614 (E.D.N.Y. 1994) ("A shooting, even in this

day and age, is a startling event."); *see also United States v. Brown*, 254 F.3d 454, 459 (2d Cir. 2001) (observation of someone wielding a firearm qualifies as a startling event for purposes of Rule 803(2); *United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990) (assault qualifies as a startling event for purposes of Rule 803(2)).  The 911 calls contain descriptions of what the callers saw and heard during the shooting, including the number of shots that they heard and where the shots were fired.  Similarly, CW-1 will recount statements from likely intended victims—no more than a couple of minutes after the shooting—who told him that the defendant was the one who fired the shots and provided a description of the clothing that the defendant was wearing during the shooting.  All of this evidence falls into the heartland of present sense impressions and excited utterances that are admissible under Rule 803(1) and Rule 803(2).

## II.     Statements by the Defendant to a Cooperating Witness While in Custody Should be Admitted

### A.     Facts

At trial, the Government intends to present testimony from CW-1 about unexpectedly seeing the defendant in the medical unit of the Essex County Correctional Facility on or about June 21, 2021.  Prior to that date, CW-1 and the defendant had not seen each other while in custody.  Quite to the contrary, the Government had specifically requested that the United States Marshals Service ensure that CW-1 and the defendant remain separated at all times while in custody for safety reasons.  The defendant—who was also in the medical unit—recognized CW-1 and immediately initiated a conversation with CW-1.  During the conversation, CW-1 alluded to the fact that CW-1 still felt offended by the defendant's participation in a violent assault and stabbing of CW-1 with other members of the Castle Hill Crew in or around 2015. The defendant stated, among other things, the following in response: (1) that CW-1 and the defendant talked about the incident afterwards to reconcile (suggesting that CW-1 and the

defendant could still be friends now); and (2) the stabbing of CW-1 was retaliation for a prior incident where a member of the Monroe Houses Crew had slashed a member of the Castle Hill Crew, which is why the defendant and other members of the Castle Hill Crew that day were looking for a rival to attack.  The statements by the defendant to CW-1 are admissible under Federal Rule of Evidence 801(d)(2)(A) and are not barred by *Massiah* and its progeny.

     **B.**    **Applicable Law**

Under Federal Rule of Evidence 801(d)(2)(A), "[s]tatements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party." *United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002); *see also United States v. Matlock*, 415 U.S. 164, 172 & n.8 (1974); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982).  Such statements are admissible, even if made to a cooperating witness and after the defendant's right to counsel has attached, provided they were not the result of any government action "designed deliberately to elicit incriminating remarks." *United States v. Rosa*, 11 F.3d 315, 329 (2d Cir. 1993) (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986); citing *Massiah v. United States*, 377 U.S. 201, 206 (1964)).  Put another way, "[t]he Sixth Amendment rights of a talkative inmate are not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant." *United States v. Allen*, No. 15 Cr. 95 (AJN), 2018 WL 1889759, at *12 (S.D.N.Y. Apr. 17, 2018) (quoting *United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997)).

Moreover, "[a]n informant generally becomes a government agent for purposes of the rule 'only when the informant has been instructed by the police to get information about the particular defendant.'" *Id.* (quoting *Birbal*, 113 F.3d at 346); *see also Ferrer v. Greiner*, 52 F. App'x 555, 556 (2d Cir. 2002).  The Second Circuit has also explained that, because "*Massiah* is

14

supposed to cover situations that 'look' like government interrogations," the rule set forth in that case "does not apply to statements made completely voluntarily by an accused," such as where the defendant initiates conversation with the government witness. *United States v. Stevens*, 83 F.3d 60, 64 (2d Cir. 1996). Moreover, even when a "signed up" cooperating witness does engage a defendant in conversation, the defendant's Sixth Amendment rights are not violated so long as the cooperating witness did not act at the express direction of law enforcement. *United States v. Whitten*, 610 F.3d 168, 193-94 (2d Cir. 2010).

### C.    Discussion

Applying the principles set forth above, the Court should allow CW-1 to testify about statements that the defendant made to him at the Essex County Correctional Facility regarding the defendant's participation in the stabbing and assault of CW-1 with other members of the Castle Hill Crew. These statements are plainly probative of the defendant's membership in the Castle Hill Crew, its rivalry with the Monroe Houses Crew, and the defendant's understanding that violent retaliation was expected of members of the Castle Hill Crew. There is no *Massiah* bar to the admissibility of the statements because law enforcement officers did not deliberately elicit the statement from the defendant. CW-1's contacts with the defendant were in no way directed or encouraged by the Government; to the contrary, the Government had previously instructed the United States Marshals Service to ensure that CW-1 and the defendant remain separated because of concerns about CW-1's safety if CW-1 and the defendant ever saw each other. Additionally, no one in law enforcement ever directed, encouraged, or even hinted that CW-1 should have any contact with the defendant or any other individuals in pretrial detention. Rather, CW-1 was repeatedly instructed not to do anything to elicit information from other inmates. Moreover, the defendant initiated contact with CW-1—his statements were

15

unprompted and not the result of any interactions resembling a government interrogation.  Based on this record, the defendant's statements to CW-1 at the Essex County Correctional Facility relating to the assault and stabbing of CW-1 are admissible.

**III.    Rap Videos and Lyrics by the Defendant Relating to the Charged Crimes Should be Admitted**

**A.    Facts**

At trial, the Government seeks to admit multiple clips of the defendant's music videos that have been publicly posted to You Tube and Facebook, as well as clips recovered from the defendant's cell phone.  Out of seventeen full length music videos in its possession, the Government has identified 10 short clips from seven videos that it seeks to introduce.[1]  In the majority of the ten music video clips, the defendant is rapping, and the defendant's lyrics describe the Castle Hill Crew.  Meanwhile, the video clips depict the defendant with other members of the Castle Hill Crew at locations of significance to the Castle Hill Crew while displaying gang signs, gang colors, and firearms.  The Government also seeks to introduce 10 excerpts from the defendant's written rap lyrics recovered from the defendant's phone.[2]

The Government seeks to offer the music video clips to corroborate the existence and purpose of the Castle Hill Crew, and the relationship among the defendant and his co-conspirators, many of whom are present alongside the defendant in the music video clips and will be identified at trial by cooperating witnesses.  For example, in multiple music video clips, the defendant raps about specific references to the Castle Hill Crew such as "coke block," "670's

---

[1] Transcripts of the lyrics for each of the clips the Government seeks to introduce, as well as the corresponding time stamps for the music videos, are set forth in Exhibit A.  In connection with this motion, the Government is submitting a disc with both the full-length music videos and music video clips it seeks to introduce.

[2] The lyrics the Government seeks to introduce are set forth in Exhibit B.

finest," "6-7-0," and the "O" at locations in and around the Castle Hill Crew's territory, including at the crew's informal headquarters at a convenience store at 670 Castle Hill Avenue. The music video clips further establish the Castle Hill Crew's violent back-and-forth conflict with the rival Monroe Houses Crew.  For example, the defendant makes multiple references to "opps," or rival gang members, throughout the music videos and specifically calls out the Castle Hill Crew's rivalry with the Monroe Houses Crew in the "WokTalk" video ("I spin on Monroe" and "I'm smoking on Benji").[3]  The music video clips are also replete with references to the Castle Hill Crew's criminal activity, including narcotics activity ("Caught me some grams for the low"), acts of violence ("And them shooters know I shoot, gang made a couple news clips" and "Cocking back aiming low, shoot to the clip when I squeeze"), and firearms possession ("Smith and Wesson the pole," "Marvi G keep a pole," and "I bought a new grip")[4].  The rap lyrics similarly establish the existence of the Castle Hill Crew, define its membership and rivalry with the Monroe Houses Crew, and describe the Castle Hill Crew's involvement in fraud, narcotics sales, and violence.

**B.    Applicable Law**

**1.    Admissibility of Rap Lyrics**

"Rap lyrics . . . are properly admitted . . . where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice." *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015).  In *Pierce*, the Second Circuit rejected a defendant's claim that admitting rap lyrics violated the First Amendment, because "speech was not the basis for the prosecution, but instead it was used to establish the existence of, and [the defendant's]

---

[3] Cooperating witnesses will explain that "Benji" is a reference to a member of the Monroe Houses Crew.
[4] Cooperating witnesses will explain that "pole" and "grip" refer to guns.

participation in, the alleged RICO enterprise." *Id.* The admissibility of rap lyrics, like other evidence, is thus determined by straightforward application of the Federal Rules of Evidence. *See id.* (citing *United States v. Moore*, 639 F.3d 443, 447-48 (8th Cir. 2011) (affirming admission of profane and violent rap recordings where lyrics were probative of defendant's participation in narcotics conspiracy)); *United States v. Belfast*, 611 F.3d 783, 820 (11th Cir. 2010) (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice where lyrics were used to show defendant's membership in criminal organization)); *United States v. Brown*, 2017 WL 2493140, *2 (S.D.N.Y. June 9, 2017).

## 2. Federal Rule of Evidence 403

Federal Rule of Evidence 403 provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." All evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that does not mean it is "unfairly" prejudicial. *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair."). The Supreme Court has defined "unfair prejudice" as "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof of the specific offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). The Second Circuit has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States* v. *Williams*, 205 F.3d 23, 34 (2d Cir. 2000); *United States* v. *Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *United States* v. *Everett*, 825 F.2d 658, 660 (2d Cir. 1987) ("Under Rule

404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony.") (citations omitted).

The Second Circuit has repeatedly found that rap lyrics are admissible under Rule 403 when they are probative of material issues at trial, like the defendant's intent and knowledge, relationship and affiliation between individuals in a racketeering conspiracy, or admissions relating to one of the charged offenses. *See Pierce*, 785 F.3d at 841 (finding that rap videos were admissible under Rule 403 as evidence of the defendant's association with the alleged RICO enterprise and his animosity towards a rival gang); *United States v. Herron*, 762 F. App'x 25, 30 (2d Cir. 2019) (finding that rap videos offered as evidence of defendant's "participation in the charged conspiracies and crimes, his position as a leader of the MMDB, his familiarity with firearms and the drug trade, and his relationship to certain cooperating witnesses" was plainly relevant and admissible under Rule 403); *United States v. Barrett*, 750 F. App'x 19, 22 (2d Cir. 2018) (rap videos properly admitted to prove defendant's (1) association with two of his co-conspirators, (2) use of the same Mercedes driven in the charged robberies, and (3) co-conspirators' possession of guns); *see also United States v. Carpenter*, 372 F. Supp. 3d 74, 78 (E.D.N.Y. 2019) (admitting videos that referred to co-conspirators, drugs, and weapons under Rule 403); *United States v. Brown*, 2017 WL 2493140, at *2 (S.D.N.Y. June 9, 2017) (DLC) (admitting rap video and lyrics under Rule 403).

### 3.    Federal Rule of Evidence 801

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy."[5]   Additionally, Rule

---

[5] To admit a statement pursuant to this rule, a district court must find by a preponderance of the

801(d)(2)(B) provides that a statement is not hearsay if offered against an opposing party and "is one the party manifested that it adopted or believed to be true."  Courts have found that rap lyrics are admissions or adopted admissions of defendants who make appearances and actively participate in the videos.  *See United States v. Graham*, 293 F. Supp. 3d 732, 738 (E.D. Mich. 2017) (finding that rap lyrics are adopted statements of defendants who "have appearances in the Rap Tracks and are seen participating by wearing gang colors, making gang signs, throwing money and singing along to the lyrics in the videos" because "it shows their adoption and belief in the statements").

### C.    Discussion

The limited music video and rap lyrics excerpts that the Government seeks to introduce are admissible under Rule 403.[6]  Indeed, the rap lyrics and music video clips, in which the defendant interacts with members of the Castle Hill Crew, acknowledges his gang affiliation, and references criminal conduct carried out in support of the enterprise, are relevant evidence

---

evidence: First that a conspiracy that included the defendant and the declarant existed; and, second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).  These prerequisites need be proved only by a preponderance.  *United States v. Orena*, 32 F.3d 704, 711 (2d Cir. 1994); *see also United States v. Padilla*, 203 F.3d 156, 162 (2d Cir. 2000).

[6] The only two music video clips that the Government seeks to introduce that are not statements of the defendant himself are admissible either as co-conspirator statements under Rule 801(d)(2)(E) or adopted admissions under Rule 801(d)(2)(B).  In the first video clip, a cooperating witness ("CW-2") will identify the rapper as a member of the Castle Hill Crew, who raps the refrain "6-7-0 coke house" on repeat—a reference to the Castle Hill Crew—while the corresponding video shows images of other Castle Hill Crew members, including the defendant, in front of the convenience store at 670 Castle Hill Road wearing gang colors.  In the second video clip, CW-1 will identify the rapper as a member of the Castle Hill Crew, who raps about his membership in the Castle Hill Crew ("Like Pete and 'em, I love my bros, I eat with them") and other Castle Hill Crew members, including the defendant ("I creep with them, you know, Jus Blaze, Gotti G and them"), while the corresponding video features images of Castle Hill Crew members in front of a building associated with the Monroe Houses Crew.

constituting direct proof of the charged crimes.  Specifically, the lyrics and the corresponding video are probative of: (1) the existence of the Castle Hill Crew, the defendant's membership in the Castle Hill Crew, and the defendant's co-conspirators in the Castle Hill Crew; (2) the defendant's possession of firearms, drugs, and proceeds of criminal activity; (3) the Castle Hill Crew's use and threatened use of violence against rival gangs, and the ways in which members of the Castle Hill Crew can increase in position and stature within the gang by committing acts of violence.  The lyrics and music videos do not contain speculative, theoretical, or abstract statements; rather, they directly relate to the charged offenses by establishing the existence of the charged enterprise and the pattern of criminal activity associated with the enterprise.[7]  *See Graham*, 293 F. Supp. 3d at 738 ("The court finds that the [rap lyrics] are not merely abstract beliefs of the defendants, because the government has tied the lyrics to the actions of the defendants."); *United States v. Stuckey*, 253 F. App'x 468, 482-83 (6th Cir. 2007) (finding that the Court properly admitted rap lyrics into evidence where lyrics "concerned killing government witnesses and specifically referred to shooting snitches, wrapping them in blankets, and dumping their bodies in the street—precisely what the Government accused Stuckey of doing to Darbins in this case.").

Meanwhile, the dangers of unfair prejudice resulting from the admission of these rap lyrics are extremely low.  The Government is only seeking to admit limited excerpts of the music videos that are narrowly tailored to address issues in the case that are disputed and does not seek to admit other portions of the rap lyrics that contain vulgar and offensive language.  *See United States v. Herron*, 2014 WL 1871090, at *5 (E.D.N.Y. May 8, 2014) (requiring the Government

---

[7]     The music video clips the Government seeks to admit from USAO_001005 are also direct proof of Count Five, as the video shows the defendant displaying the firearm recovered on December 10, 2020 while rapping, "Just caught a new case, bail money paid and I bought a new grip."  Cooperating witnesses will testify that "grip" refers to a gun.

to provide the Court with the specific excerpt that it intends to present to minimize the risk of unfair prejudice from portions of the video with minimal relevance). Additionally, the excerpted rap lyrics are no more inflammatory than the actual charges in this case, which involve attempted murders, shootings, gun possession, and narcotics distribution. *See United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (explaining that evidence is not unduly prejudicial when it is not "more inflammatory than the charged crime[s]"); *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir 1992) (noting evidence "did not involve conduct any more sensational or disturbing than the crimes with which [the appellants] were charged")). Based on this record, there is no risk that unfair prejudice will substantially outweigh the probative value of the music video clips and rap lyrics.

## IV.   The Court Should Admit Limited Testimony Regarding the Defendant's Supervision on Parole in July 2020

### A.   Relevant Facts

Count Four of the Indictment relates to the defendant's arrest in possession of a loaded firearm on July 10, 2020. On that date, NYSDOCCS Parole Officer Laverne McGill conducted an unannounced home visit to verify whether the defendant was in compliance with his parole. The defendant was not present in his home as required. Later that morning, Parole Officer McGill was in the Soundview neighborhood when she saw the defendant in the distance walking across the street. McGill then saw the defendant walk into the deli located at 670 Castle Hill Avenue. Parole Officer McGill then entered the deli and arrested the defendant. The defendant was in possession of a fanny pack containing a loaded firearm.

Count Five of the Indictment relates to the defendant's possession of a loaded firearm in or around December 2020, which was recovered on December 10, 2020. As part of the evidence of the defendant's possession of the loaded firearm, the Government intends to introduce a rap

video found during a search of the defendant's cellphone, *See* Video from Cellphone, attached hereto as Exhibit C.[8]  During the video, the defendant states the following while brandishing the firearm towards the camera: "I'm off parole now, so I'm a talk my shit.  Just caught a new case.  Bail money paid.  And I bought a new grip."  *See* Exhibit C at 00:50.

### B.    Applicable Law

The Second Circuit has made clear that it follows an "inclusionary approach" to the admissibility of prior-acts evidence under Federal Rule of Evidence 404(b).  "[S]uch evidence is admissible for *any purpose* other than to show the defendant's criminal propensity."  *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (quoting *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006)).  Additionally, "evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial."  *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)); *see also United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (explaining that evidence of other acts is admissible to "provide background for the events involved in the case" and "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense").

In addition to setting forth these general principles, courts have specifically allowed evidence of a defendant's parole or supervised release status where it probative of the defendant's guilt or innocence of the charged crimes.  *See, e.g.*, *United States v. Stitsky*, 536 F.

---

[8] Exhibit C is attached on the disc submitted by the Government.  Exhibit C also contains substantially the same lyrics and corresponding video as the clip the Government seeks to introduce from USAO_001005.  *See* Exhibit A.

App'x 98, 106–07 (2d Cir. 2013) (finding no plain error in allowing testimony about terms of defendant's supervised release because omission of information from reports supported an inference of knowledge that defendant was engaged in illegal activities); *United States v. Paredes,* 176 F. Supp. 2d 192, 194-95 (S.D.N.Y. Nov. 29, 2001) (prior conviction and parole violation explained defendant's reluctance to travel to New York and instead used couriers); *United States v. Thomas*, 2014 WL 2168468, at *7 (D. Conn. May 23, 2014) (admitting evidence that defendant was on parole when relevant to identity); *see also Doe v. Lima*, 2020 WL 728813, at *7 (S.D.N.Y. Feb. 13, 2020) (admitting evidence that plaintiff in § 1983 lawsuit because authority of NYSDOCCS over plaintiff would "otherwise not make sense"); *Leniart v. Bundy*, 2013 WL 1673025, at *4 (D. Conn. Apr. 17, 2013) (admitting evidence that plaintiff was on parole in § 1983 case because parole status was "relevant to the reasonableness of the parole officers' actions").

### C.    Discussion

Applying these principles set forth above, the Court should allow limited evidence of the fact that the defendant was on parole in or around July 2020.  As described above, the defendant's parole officer was the individual who arrested the defendant in possession of a loaded firearm on the morning of July 10, 2020, and the Government anticipates that the parole officer's credibility, her familiarity with the defendant, and her observations of the defendant that day will be hotly contested issues at trial for Count Four.  As a result, the only way for the jury to understand the parole officer's testimony about the arrest is for the parole officer to explain that: (1) she is familiar with the defendant because she served as his parole officer; (2) she was keeping an eye out for the defendant because she knew that the defendant was associated with the area around the Castle Hill Houses; and (3) the reason why she immediately approached the

defendant and arrested him was because she had just discovered a violation of the defendant's curfew earlier that morning.  Without this additional context, the jury will be left totally confused about the reasonableness of the actions of Joseph's parole officer leading up to the defendant's arrest and the recovery of the loaded gun.  Indeed, the jury may be led to believe that the parole officer indiscriminately stopped the defendant inside of a convenience store for no apparent reason whatsoever.  As a result, circumstantial references to the defendant's parole status by his parole officer are necessary to "provide background for the events involved in the case" and to provide "context of certain events relevant to the charged offense."  *Inserra*, 34 F.3d at 89.

Similarly, the Court should allow the jury to hear the defendant's own words about why he was in possession of another firearm in December 2020 so shortly after being arrested with a firearm in July 2020: "I'm off parole now, so I'm a talk my shit.  Just caught a new case.  Bail money paid.  And I bought a new grip."  *See* Exhibit C at 00:50.  At trial, the Government anticipates that the defendant will suggest that he had no knowledge of the loaded firearm recovered in a ditch on the night of his arrest on December 10, 2020, and any firearms that the defendant displayed in videos were fake and mere props—an argument that the defendant raised in the bail proceedings in this case.  Similarly, the Government anticipates that the defendant may argue that his rap videos contain mere puffery and false statements about the extent of his involvement in criminal activity.  The rap lyrics in Exhibit C, however, dispel this argument. The defendant indicates that he has completed his parole supervision, and so he is comfortable speaking openly and honestly about his criminal activity on social media. ("I'm off parole now, so I'm a talk my shit.").  Joseph's parole officer will similarly confirm that Joseph was dismissed from parole after he was arrested in July 2020, and the "new case" that the defendant refers to directly relates to his parole violation and charges for possession of a firearm in July 2020.  In

the same breath, Joseph then admits that he purchased a new firearm ("bought a new grip").  The true statements about the end of the defendant's parole supervision demonstrate that the defendant is telling the truth in these rap lyrics.  He in fact is in possession of a new gun, and the gun that the defendant is brandishing in the video—which bears a striking resemblance to the gun recovered by police officers on December 10, 2020—is a real gun, not a prop for use in a rap video.

Finally, the Government notes that any risk of unfair prejudice here under Rule 403 is simply non-existent.  Because the defendant is being charged with violations of § 922(g), the jury will already learn that the defendant is a convicted felon.  *See United States v. Pierce*, 136 F.3d 770, 776 (11th Cir. 1998) (finding little prejudice in admitting testimony from a probation officer when jury heard other information concerning the defendant's prior contact with the criminal justice system).  Additionally, the defendant's status on parole pales in comparison to the other crimes charged in the Indictment—participation in multiple acts of violence, drug trafficking, and fraud as a member of a violent street gang, including the shooting of a 12-year old child in a playground.  To the extent there is any risk of unfair prejudice, the Court can provide a proper limiting instruction to the jury, which will similarly be given by the Court in relation to the jury instructions for the § 922(g) charges.  *See United States v. Williams*, 205 F.3d 23, 24 (2d Cir. 2000) (finding no violation of Rule 403 where other crimes evidence is less serious than underlying crimes charged, and a limiting instruction is given); *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (same).

## V.    The Court Should Preclude Cross-Examination of Law Enforcement Witnesses Regarding Unrelated Allegations of Professional Misconduct

The Government expects to call several law enforcement witnesses who have been named as defendants in civil lawsuits and/or have been the subject of civilian complaints that the

City of New York's Civilian Complaint Review Board ("CCRB") found to be substantiated. The Court should preclude cross-examination regarding these allegations of misconduct because they are unrelated to the facts of this trial, have no bearing on the witnesses' character for truthfulness, do not constitute evidence of bias or a motive to lie, and are more prejudicial than probative.

### A.      Applicable Law

District courts have "broad discretion in controlling the scope and extent of cross-examination." *United States v. James*, 712 F.3d 79, 103 (2d Cir. 2010) (quotation marks omitted). Moreover, it is well-established that the Court has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, . . . confusion of the issues . . . or interrogation that is repetitive or only marginally relevant" to the issues in dispute. *United States v. Figueroa*, 548 F.3d 222, 229 (2d Cir. 2008) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *see also* Fed. R. Evid. 611(a) (noting that courts "shall exercise reasonable control" over cross-examination to "avoid needless consumption of time" and to "protect witnesses from harassment or undue embarrassment") and 611(b) (limiting scope of cross-examination of witnesses to subject matter of direct examination and matters affecting credibility of witnesses).

Under Federal Rule of Evidence 608(b), cross-examination about prior conduct by a witness is only permissible if the conduct in question is probative of truthfulness. *See* Fed. R. Evid. 608(a) & (b); Fed. R. Evid. 608(a) advisory committee's note ("In accordance with the bulk of judicial authority, the inquiry is strictly limited to character for veracity, rather than allowing evidence as to character generally."). Further, even if such prior conduct is relevant to truthfulness, the Court may still exclude cross-examination of such conduct if it finds that the

27

"probative value [of the testimony] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403; *accord United States v. Devery*, 935 F. Supp. 393, 407-08 (S.D.N.Y. 1996) ("Such [prior] acts are only admissible insofar as they bear on a witness's propensity for truthfulness or untruthfulness, and, even if the prior act does concern the witness's character for truthfulness under Rule 608(b), its probative value must not be substantially outweighed by its unfairly prejudicial effect under Rule 403.").

### 1.     Substantiated Findings of Misconduct

Applying these principles, cross-examination regarding substantiated complaints of misconduct is properly precluded when the misconduct has no bearing on the witness's truthfulness, bias, or any other material issues in dispute in the case.  *See United States v. Teron*, 478 F. App'x 683, 685 (2d Cir. 2012) (precluding cross-examination regarding substantiated CCRB improper search complaint was proper because it had no bearing on the witness's truthfulness);; *United States v. Horsford*, 422 F. App'x 29, 30 (2d Cir. 2011) (precluding cross-examination regarding substantiated CCRB was proper where the underlying conduct involved no dishonesty); *United States v. Lawes*, 292 F.3d 123, 131-32 (2d Cir. 2002) (precluding cross-examination regarding substantiated CCRB excessive force complaint was proper because it had no bearing on the witness's truthfulness or the circumstances of the trial defendant's arrest); *United States v. Lights*, 2016 WL 7098633, at *4 (S.D.N.Y. Dec. 5, 2016) (precluding cross-examination regarding substantiated CCRB abuse of authority complaint because it "does not weigh towards [the witness]'s propensity for truthfulness"); *United States v. Polanco*, 2011 WL 1795293, at *4 (S.D.N.Y. May 3, 2011) (precluding cross-examination regarding substantiated CCRB improper search complaint because it did not bear on witness's credibility).

28

Courts precluding cross-examination based on CCRB proceedings have also observed that the informal and non-adversarial nature of the CCRB investigative process minimizes the probative value of cross-examination regarding these complaints. *See United States v. Nelson*, 2011 WL 2207584, at *5 (S.D.N.Y. June 3, 2011) (holding that "given the informal and non-adversarial nature of the CCRB investigative process, any probative value of the CCRB complaint was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and waste of time under Rule 403"); *United States v. Smith*, 2007 WL 188734 (S.D.N.Y. Jan. 24, 2007) ("The proceedings before the CCRB lack formality, are unrelated to the instant action, and are only tangentially relevant if at all, and any minimal probative value that these incidents may have on [the witnesses'] credibility is substantially outweighed by the danger of unfair prejudice and delay.").

This Court has previously precluded cross-examination regarding substantiated CCRB complaints for all of the forgoing reasons. *United States v. Nelson*, 2011 WL 2207584 (S.D.N.Y. June 3, 2011).

## 2. Civil Lawsuits

Courts also routinely preclude cross-examination of law enforcement witnesses regarding civil lawsuits in which the witnesses are named because lawsuits are mere allegations and therefore lack any probative value. *LSSi Data Corp. v. Time Warner Cable, Inc.*, 892 F. Supp. 2d 489, 502 (S.D.N.Y. 2012) (explaining that allegations in a civil complaint had no evidentiary value and collecting cases supporting this proposition); *Phillips v. City of New York*, 871 F. Supp. 2d 200, 203 n.2 (E.D.N.Y. 2012) ("[A]ny probative value of the complaints would be substantially outweighed by the danger of unfair prejudice to the Defendant Officers because the lawsuits are mere allegations. . . . "); *Saldarriaga v. United States*, 2002 WL 449651, at *4 (S.D.N.Y. Mar. 21, 2002) ("Unsubstantiated civil rights allegations made against [the witness]

would have no bearing on his 'character for truthfulness.'  Any cross-examination regarding such allegations would have been irrelevant and improper under the Federal Rules of Evidence."); *Dicks v. United States*, 2010 WL 11484356, at \*5-\*6 (E.D. Pa. Sept. 8, 2010) (finding that "civil lawsuits were only allegations at the time of trial, and never resulted in any finding of misconduct; accordingly, the probative value was minimal in comparison to the grave risk of unfair prejudice") (collecting cases); *United States v. Morrison*, 98 F.3d 619, 628 (D.C. Cir. 1996) (affirming district court's preclusion of cross examination regarding civil complaint because "the mere *filing* of a complaint is not probative of truthfulness or untruthfulness, regardless of whether the allegations in the complaint, if true, would seriously undermine the witness' credibility" (quotation marks omitted))..

## B.    Discussion

Detective-1 will testify that on April 28, 2017, he reported to the hospital where the twelve-year-old victim of the Story Playground Shooting was being treated and vouchered the bullet that was recovered from the victim's body during surgery.  Detective-1 will also testify that he participated in an arrest of the defendant in June 2017, during which the defendant indicated that his home address was 820 Thieriot Avenue—an apartment building adjacent to the Story Playground and the same building in which the defendant is seen on surveillance video moments before the Story Playground Shooting.  Detective-1 has one substantiated CCRB complaint, and it involves improperly frisking an individual in 2015.  This incident is entirely unrelated to the instant case and has no bearing on Decetive-1's credibility.

Officer-1 was one of the first responders to the scene of the Story Playground Shooting and will testify regarding his observation of the twelve-year-old victim.  Officer-1 has one substantiated CCRB complaint, and it involves improperly frisking an individual in 2014.  This incident is entirely unrelated to the instant case and has no bearing on Officer-1's credibility.

Sergeant-1 participated in the arrest of the defendant on December 10, 2020 and will testify regarding vouchering of the defendant's cellphone at the time of arrest.  Sergeant-1 has one substantiated CCRB complaint, and it involves improperly searching the boiler room of an apartment building.  This incident is entirely unrelated to the instant case and has no bearing on Sergeant-1's credibility.

None of the aforementioned substantiated CCRB complaints involve findings of untruthfulness, nor do they involve mishandling of evidence or otherwise relate to the subject matters of the witnesses' anticipated testimony.  Accordingly, cross-examination regarding these incidents should be precluded.

In addition, some of the law enforcement witnesses who will testify at trial are named in civil lawsuits. The Government is unaware of adverse credibility findings against the officers, and unaware of any link between those lawsuits and the instant criminal case.  Accordingly, cross-examination regarding these lawsuits should also be precluded.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court grant the

Government's motions *in limine*.

Dated:  New York, New York
         July 23, 2021

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        United States Attorney for the
                                        Southern District of New York


                          By:     _/s/_____
                                        Andrew K. Chan
                                        Emily A. Johnson
                                        Celia V. Cohen
                                        Assistant United States Attorneys
                                        (212) 637-1072 / 2409 / 2466