UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

   UNITED STATES OF AMERICA         :

                                    :     S2 20 Cr. 603 (PKC)

        - v. -               :

                                      :

   NICHOLAS JOSEPH,         :

      a/k/a "Gotti,"         :

      a/k/a "Finesse,"       :

                                      :

                 Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S MEMORANDUM IN OPPOSITION
### TO DEFENDANT'S MOTION PURSUANT TO RULE 29 AND RULE 33

> DAMIAN WILLIAMS
> United States Attorney
> Southern District of New York
> One St. Andrew's Plaza
> New York, New York 10007

ANDREW K. CHAN
CELIA V. COHEN
EMILY A. JOHNSON
Assistant United States Attorneys
     -Of Counsel-

## <u>TABLE OF CONTENTS</u>

**BACKGROUND** .................................................................................................................. 1

**SUMMARY OF THE FACTS ADDUCED AT TRIAL WITH RESPECT TO COUNTS TWO AND THREE** ............................................................................................................................. 2

    A.   The Castle Hill Crew ......................................................................................... 2

    B.   The April 28, 2017 Story Playground Shooting ................................................ 4

**ARGUMENT** ...................................................................................................................... 7

   I.   Sufficient Evidence Supported the Defendant's Conviction for the Story Playground Shooting (Counts Two and Three) .............................................................................. 7

    A.   Applicable Law ................................................................................................. 7

    B.   Discussion ......................................................................................................... 9

   II.   The Defendant's Motion for a New Trial Should Be Denied. .................................. 13

    A.   Applicable Law ............................................................................................... 13

    B.   Discussion ....................................................................................................... 14

**CONCLUSION** .................................................................................................................. 20

# **TABLE OF AUTHORITIES**

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979)......................................................... 8

*Morris v. United States*, 523 F. App'x 7, 9 (2d Cir. 2013)................................. 16, 17

*Rosales-Lopez v. United States*, 451 U.S. 182, 190 (1981) ............................... 18, 19

*United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) ..................................... 7

*United States v. Ballistrea*, 101 F.3d 827, 837 (2d Cir. 1996).............................. 16

*United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005)............................. 15, 17

*United States v. Collins*, 665 F.3d 454, 459–60 (2d Cir. 2012).......................... 15

*United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) ................................... 8, 9

*United States v. Diaz*, 854 F. App'x 386, 388 (2d Cir. 2021).......................... 18, 21

*United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)................................... 8

*United States v. Farmer*, 583 F.3d 131, 143-44 (2d Cir. 2009)........................... 13

*United States v. Florez*, 447 F.3d 145, 156 (2d Cir. 2006)............................... 13

*United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) ........................... 14

*United States v. George,* 779 F.3d 113, 115 (2d Cir. 2015) ............................... 8

*United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002)...................................... 9

*United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) ........................... 9

*United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) ................................. 8

*United States v. Jones*, 482 F.3d 60, 68 (2d Cir. 2006) ................................... 12

*United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002) ............................... 18

*United States v. Mejia*, 356 F.3d 470, 474 (2d Cir. 2004) ............................... 15

*United States v. Parse*, 789 F.3d 83, 110–11 (2d Cir. 2015)........................... 18

*United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) ............................... 8

*United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) ........................ 14

*United States v. Treacy*, 639 F.3d 32, 46 (2d Cir. 2011) ............................... 21

*United States v. Vasquez*, 267 F.3d 79, 90-91 (2d Cir. 2001)........................... 9

## GOVERNMENT'S MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S MOTION PURSUANT TO RULE 29 AND RULE 33

The Government respectfully submits this memorandum of law in opposition to Defendant Nicholas Joseph's motion seeking a judgment of acquittal with respect to Counts Two and Three, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and in the alternative, a new trial, pursuant to Rule 33.  (Dkt. No. 92, "Mot.").  Because the evidence was more than sufficient to support the jury's verdict of guilty and because there is no real concern that an innocent person may have been convicted, the defendant's motion should be denied.

## BACKGROUND

On or about July 27, 2021, a grand jury sitting in this district returned superseding indictment S2 20 Cr. 603 (PKC) (the "Indictment") (Dkt. No. 33).  The Indictment charged the defendant with participating in a racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d) (Count One); attempted murder and assault with a dangerous weapon in aid of racketeering, in violation of Title 18, United States Code, Sections 1959 and 2 (Count Two); using and carrying a firearm in furtherance of a crime of violence, which was discharged, in violation of Title 18, United States Code, Sections 924(c) and 2 (Count Three); and two counts of being a felon in possession of a firearm and ammunition, in violation of Title 18, United States Code, Sections 922(g) and 2 (Counts Four and Five).  Counts One through Three relate to the defendant's participation in a gang based in the Castle Hill Houses in the Soundview neighborhood of the Bronx (the "Castle Hill Crew"), which committed a variety of different crimes, including narcotics trafficking, bank fraud, assaults, and attempted murders (including shootings).  Counts Two and Three relate to the defendant's commission of a shooting in the Story Playground in the Bronx on April 28, 2017 (the "Story Playground Shooting").  The intended victims of the Story Playground Shooting were members of a rival gang, but an innocent bystander—a 12-year old

child playing basketball in the playground—was shot instead.  Counts Four and Five related to separate incidents on July 10, 2020 and between in or around November 2020 and December 10, 2020 when the defendant—a convicted felon—illegally possessed loaded firearms.

Trial commenced with jury selection on September 13, 2021.  Following approximately four days of evidence, including testimony from two cooperating witnesses and multiple law enforcement witnesses, physical evidence, and text messages, photographs, and videos from social media and the defendant's cellphone, the jury convicted the defendant on all counts.  With respect to Count Two, the jury found that the defendant was guilty of both assault with a dangerous weapon and attempted murder.  (Dkt. No. 69).  With respect to Count Three, the jury found that the firearm was discharged.  (*Id.*).  Sentencing is currently scheduled for January 5, 2022.

## SUMMARY OF THE FACTS ADDUCED AT TRIAL WITH RESPECT TO COUNTS TWO AND THREE

### A.    The Castle Hill Crew

Evidence at trial established the existence of the Castle Hill Crew, a gang based in and around the Castle Hill Houses in the Soundview neighborhood of the Bronx, and the defendant's membership and participation in the Crew.  Cooperating witnesses—a member of the Castle Hill Crew and a rival gang member from the James Monroe Houses—identified the defendant as a Castle Hill Crew member.  (Tr. at 217, 547, 653).[1]  The same cooperating witnesses identified the defendant in multiple photographs and music videos alongside fellow members of the Castle Hill Crew.  (*See, e.g.*, GX 308A; 308B; 309A; 309B; 309F; 310-13; 315; 315A; 317F; 503-3; 503-26; 730C).  Additionally, the defendant advertised his membership in the Castle Hill Crew in his social media posts, (*see* GX 752, 754), through his rap lyrics, (*see, e.g.,* GX 308A, 309A, 312), by

---

[1] As used herein, "Tr." refers to the trial transcript.

wearing clothes associated with the Castle Hill Crew, (*see* GX 310D, 319B), and by marking his arm and hand with Crew-related tattoos, (*see* GX 503-4, 503-39, 705).

A deli in the vicinity of the Castle Hill Houses located at 670 Castle Hill Avenue (the "670 Deli") was the Castle Hill Crew's unofficial headquarters, where the Crew, including the defendant, would meet up to hang out and exchange information.  (Tr. at 265-67, 548-49, 656, 659).  Crew members also sold drugs at the 670 Deli and at the Crew's other headquarters, 2160 Seward Avenue, a building located within the Castle Hill Houses.  (Tr. at 307-08, 546, 548, 559, 656).  In addition, the Crew sold drugs together in Maine, and engaged in bank fraud schemes together.  (Tr. at 375-76, 589-91, 599-600).

The Castle Hill Crew also had longstanding violent rivalries with nearby housing developments, including a group of gang members affiliated with the James Monroe Houses (the "Monroe Crew").  (Tr. at 245-46, 554-55).  Cooperating witnesses testified at trial about the rules and expectations of being a member of these Crews.  For example, if a member of the Monroe Crew were attacked by a member of the Castle Hill Crew, the Monroe Crew member would be expected to retaliate with violence, or "put in work," against any member of the Castle Hill Crew.  (Tr. at 246-47, 319, 554).  Putting in work against the gang's opponents, which could include violent acts such as stabbings, shootings, and slashings, allowed a crewmember to "earn [his] stripes," or gain respect from fellow gang members.  (Tr. at 247-48).  On the other hand, if a crewmember failed to retaliate when attacked, penalties ranged from losing respect or status in the gang to being attacked by the gang.  (Tr. at 248, 554-55).  Angel Arroyo, a cooperating witness and former Monroe Crew member, identified the defendant as one of the Castle Hill Crew members who "put in work" by committing shootings, stabbings, and slashings.  (Tr. at 276).  Among other incidents, Arroyo described being stabbed multiple times by the defendant and

another Castle Hill Crew member.  The defendant later told Arroyo that the stabbing was retaliation for a violent altercation between members of the Castle Hill Crew and Monroe Crew earlier that same day.  (Tr. at 326-27, 329; GX 601).

### B.     The April 28, 2017 Story Playground Shooting

The Story Playground Shooting, where a 12-year old child playing basketball was shot, was another act of violence committed by the defendant as part of his membership in the Castle Hill Crew.  The day before the Story Playground Shooting, Arroyo described an incident where "Nasir," a Monroe Crew member, fired shots at the defendant for being in Monroe Territory. Specifically, Arroyo was hanging outside one of the apartment buildings in the Monroe Houses with other members of the Monroe Crew when they observed the defendant and another member of the Castle Hill Crew, "CJ," walking through Monroe Territory.  (Tr. at 335-36).  Arroyo gave a gun he was holding for the Monroe Crew, a .32 revolver, to another member of the Monroe Crew, "Willy," who was upset and wanted to shoot at the defendant and CJ.  (Tr. at 336-37).  Willy, joined by Nasir, brought the revolver with him to confront the defendant and CJ but ultimately returned to the Monroe Crew without firing shots.  (Tr. at 346).  After returning to the group, Nasir took the firearm from Willy, and Nasir followed the defendant and CJ behind another building in the Monroe Houses.  (Tr. at 347-48).  Arroyo next heard one gunshot, after which he saw Nasir run in one direction and the defendant and CJ run in the opposite direction.  (Tr. at 348-49). Arroyo, who was holding a second firearm, chased after the defendant and CJ with another member of the Monroe Crew but was not able to catch up to them.  (Tr. at 349-50).

The next day, April 28, 2017, Arroyo was hanging out in the middle of the Monroe Houses with other crewmembers when Nasir and "Latief," another Monroe Crew member, walked in the direction of the Story Playground, which is located just outside the Monroe Houses between Taylor Avenue and Theriot Avenue.  (Tr. at 350-51; GX 202).  Nasir and Latief told Arroyo that they

were going to sell drugs to someone in Carol Gardens, a set of private apartment buildings across from the Story Playground, which included the building at 820 Thieriot Avenue where the defendant lived.  (Tr. at 153, 167, 217, 274-75, 350-51; GX 743, 903).  A few minutes after Nasir and Latief left the group, Arroyo heard three or four gunshots coming from the same direction where Nasir and Latief had just walked.  (Tr. at 351-52).  As Arroyo was running toward the Playground just a few seconds after the gunshots were fired, he crossed paths with Latief and Nasir, who were running back to the Monroe Houses.  (Tr. at 352-54).  Both Latief and Nasir told Arroyo that the defendant had just shot at them in the basketball courts of the Story Playground. (Tr. at 352-55).

ShotSpotter, a system of sensors used to detect and geolocate gunfire, detected three gunshots at 820 Theriot Avenue on April 28, 2017 between 5:09:31 and 5:09:40 p.m.  (GX 1000). Minutes prior to the gunshots, surveillance video from 820 Thieriot Avenue, the defendant's apartment building, recorded the defendant and two other individuals in the lobby and outside of the entrance to 820 Theriot Avenue.  The defendant was dressed in the same distinctive sweatpants that the defendant previously wore in photographs posted on social media, (*compare* GX 301, 302, *with* GX 755, 756), and the defendant's forearm tattoo was visible (*compare* GX 301, 302, *with* GX 315A, 503-28).  A few hours before the shooting, the defendant had also stated in a message on social media that he was home at 820 Thieriot Avenue.  (GX 743).  After the Story Playground Shooting, when law enforcement collected surveillance video from 820 Thieriot Avenue on April 28, 2017, the superintendent of the building identified the defendant in the surveillance video.  (Tr. at 166).

Beginning at approximately 5:07 p.m. on April 28, 2017, surveillance video recorded the defendant and two accomplices, one wearing a black t-shirt and the other wearing a white-t shirt,

enter the lobby of 820 Thieriot Avenue. (GX 301). The accomplice wearing a black t-shirt held a white plastic bag and remained in the building's vestibule, while the defendant and the accomplice in the white t-shirt waited just outside the front door to the building. (*Id.*). Just before 5:09 p.m., video recorded the defendant walking down 820 Thieriot's front steps toward the street, with the accomplice in the white t-shirt several paces behind the defendant. (GX 302). The defendant first turned in one direction before doubling back and heading in the other direction toward the Story Playground's basketball courts. (*Id.*) The defendant then ran back to 820 Thieriot at full speed, accompanied by the accomplice in the white t-shirt. (*Id.*) Both ducked into the vestibule, where surveillance video recorded the defendant reaching into the white plastic bag held by the accomplice in the black t-shirt. (GX 301, 301B, 301BB, 301BBB). The defendant pulled out a gun, which surveillance video recorded him holding in his hand, pointed down at the ground. (GX 302, 302C, 302CC, 302CCC, 302D, 302DD, 302DDD, 302E, 302EE, 302EEE). At 5:09:21 p.m., video recorded the defendant, gun in hand, running from the front door of 820 Thieriot down the building's ramp in the direction of the Story Playground. (GX 302). The defendant disappeared from the camera's view at 5:09:26 p.m., five seconds before ShotSpotter detected the initial gunshot directly in front of 820 Thieriot Avenue. (GX 302, 1000). Inside the Story Playground, a 12-year-old was struck in the hip by one of the bullets. (Tr. at 143; GX 212, 602).

Following the shooting, the surveillance video from 820 Thieriot Avenue recorded the defendant's accomplices returning to the building and walking through the building's lobby, while the defendant did not return. (GX 301). Christopher Cruz, a cooperating witness and member of the Castle Hill Crew, testified that other members of the Castle Hill Crew, while at the 670 Deli, had bragged about how the defendant had "put in work" for Castle Hill in a park in 2017. (Tr. at 611-612). After this conversation, the defendant "became somebody" in the Castle Hill Crew and

"had more status than most of the people that was in the gang." (Tr. at 612).  Finally, the defendant's cellphone preserved search history listing several searches and websites visited in December 2020—over three years after the Story Playground Shooting—related to the event, including the search "[Victim's Name] talks in hospital Bronx" and news stories about the Shooting.  (Tr. at 845-851; GX 507, 508).

## ARGUMENT

### I.     Sufficient Evidence Supported the Defendant's Conviction for the Story Playground Shooting (Counts Two and Three)

Because sufficient evidence supported the defendant's conviction for the Story Playground Shooting (Counts Two and Three), the defendant's motion for a judgment of acquittal as to those counts should be denied.  The defendant argues that the jury's verdict on Counts Two and Three should be set aside because there was insufficient evidence that the defendant committed the Story Playground Shooting at all, and insufficient evidence that, even if he did commit the Shooting, he did so to increase or maintain his position in the Castle Hill Crew.  (Mot. at 8-9).  In particular, the defendant argues that: (1) there were no witnesses who observed the defendant with a gun in his hand during the Story Playground Shooting; (2) there was insufficient evidence to corroborate Arroyo's testimony about Monroe Crew members shooting at the defendant on April 27, 2017— the day before the Story Playground Shooting—including from ShotSpotter; and (3) the victim's mother testified about hearing through neighborhood talk that the shooting was a personal matter related to the defendant's girlfriend.  All of these arguments fail.

### A.     Applicable Law

A defendant challenging the sufficiency of the evidence "bears a heavy burden."  *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008)).  A conviction must be upheld if "*any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).  The Court cannot disturb a jury's verdict unless "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (internal quotation marks omitted).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed "in the light most favorable to the Government." *United States v. George,* 779 F.3d 113, 115 (2d Cir. 2015).  The Court must analyze the pieces of evidence "in conjunction, not in isolation," *Persico*, 645 F.3d at 104 (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *Cuti*, 720 F.3d at 462 (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)).  The Court must also "credit[] every inference that the jury might have drawn in favor of the government," because "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court." *Cuti*, 720 F.3d at 461-62 (internal quotation marks and citations omitted).  The Court must credit the testimony of witnesses even if they "testified pursuant to cooperation agreements with the Government" and even if "their testimony was pock-marked with inconsistencies." *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002); *see, e.g.*, *United States v. Vasquez*, 267 F.3d 79, 90-91 (2d Cir. 2001) (deferring to jury's assessment of credibility notwithstanding the defendant's claim of "inconsistencies and lies" within testimony of Government's witnesses).

## B.      Discussion

Applying the deferential standard of review described above, there was ample evidence supporting the jury's verdict that the defendant committed the Story Playground Shooting and that he did so in connection with his membership in the Castle Hill Crew.

*First*, there was overwhelming direct and circumstantial evidence that the defendant was responsible for the Story Playground Shooting.  The defendant argues that the Government did not offer eyewitness testimony regarding his commission of the Story Playground Shooting.  But he is simply wrong.  Arroyo testified that the two intended victims of the Shooting—Monroe Crew members Nasir and Latief—ran back from the playground and told him that the defendant had just shot at them.  (Tr. at 353-54).  These statements were admitted as excited utterances and present sense impressions and therefore admissible for their truth.  (9/8/21 Tr. at 19-20; Fed. R. Evid. 803(1), (2)).  In any event, eyewitness testimony is not a legal requirement, and there was ample evidence from other sources that the defendant committed the Story Playground Shooting.  For example, there was surveillance video from the defendant's own apartment building showing the defendant arming himself with a gun and then running toward the playground mere seconds before the shots were fired.  (GX 301, 301A, 301AA, 301B, 301BB, 302, 302A, 302AA, 302B, 302BB, 302C, 302CC, 302CCC, 302D, 302DD, 302E, 302EE, 302EEE).  ShotSpotter evidence shows that three shots were fired from the area just outside of the defendant's apartment building, precisely where he was based on the surveillance video discussed above.  (Tr. at 194-95; GX 1000).  There is little question that it is the defendant in the video given, for example, that the defendant is wearing distinctive sweatpants seen in earlier social media posts, (GX 755, 756); the defendant's arm tattoos are visible in the video, (*Compare* GX 301, 302, 503-28, 315A); and just hours before the Shooting, the defendant stated in a private message transmitted over social media that he was indeed at his apartment building, (GX 743).

9

The defendant's motive for the shooting—shooting at Monroe Crew members—confirms that he was the shooter and also establishes that he committed the shooting in connection with his membership in the Castle Hill Crew.  There was extensive evidence of the longstanding rivalry between the Castle Hill Crew and the Monroe Crew, including the concepts of "putting in work," "spinning" (hunting rivals in their territory for any reason and no reason), and also of retaliation— that if the other Crew hit, you had to hit back.  Arroyo and Cruz both testified about the longstanding violent conflict between the Castle Hill Crew and the Monroe Crew.  (Tr. at 245-46; 554).  As gang members from the Monroe Houses and the Castle Hill Houses, both Arroyo and Cruz were familiar with the term "put in work" or "putting in work," which means to commit acts of violence against rival gang members to gain power and respect within the gang.  (Tr. at 247-48; 553).  Arroyo further explained that "spinning" is to "circle areas" where rival gang members are likely to be present and to "run into your ops and cause bodily harm to them."  (Tr. at 246-47).  Arroyo and Cruz also testified that if a gang member was attacked by a member of a rival gang, they were expected to retaliate.  (Tr. at 248; 554).  Failure to retaliate could result in the loss of respect, or even becoming a target for violence by other members of the Castle Hill Crew.  (Tr. at 248; 554-55).

Arroyo testified about specific episodes of back-and-forth violence between the Castle Hill Crew and the Monroe Crew: the slashing of "Malik" (a member of the Monroe Crew) by a member of the Castle Hill Crew, (Tr. at 316); a stabbing of "Quaron" (a member of the Castle Hill Crew) by members of the Monroe Crew, (Tr. at 317); a shooting of members of the Monroe Crew by "Tyler" of the Castle Hill Crew, (Tr. at 320-23); a stabbing of Arroyo by the defendant and another member of the Castle Hill Crew, (Tr. at 323-27); a fight between "Boogie" from the Monroe Crew and the defendant and "Lucci" from the Castle Hill Crew, (Tr. at 333-34).  All of these acts of

violence ultimately led to Nasir from the Monroe Crew shooting at the defendant on April 27, 2017, (Tr. at 336-37, 343-50), followed by the defendant's commission of the Story Playground Shooting on April 28, 2017, (Tr. at 350-355). Indeed, even after the Story Playground Shooting, the violence continued between the Castle Hill Crew and the Monroe Crew. Arroyo later fired shots at members of the Castle Hill Crew prior to his arrest in 2017. (Tr. at 249, 356-57).

Evidence from social media, rap videos, and the defendant's own cellphone corroborated Arroyo and Cruz's testimony about how violence against the Monroe Crew was firmly embedded into the culture of the Castle Hill Crew. (*See, e.g.*, GX 311; GX 312). In their rap videos, the defendant and other members of the Castle Hill Crew bragged about committing acts of violence against rival gang members. (Tr. at 294, 301). In one rap video, the defendant even stated: "I spin on Monroe"—indicating his desire to cause harm to people from the Monroe Houses. (Tr. at 301-02). Similarly, the defendant's cellphone contained a text message exchange with other members of the Castle Hill Crew where the defendant bragged that "I'm beefing with the whole Monroe where I grew up at . . . I started it." (Tr. at 683; GX 511).

Putting any doubts to rest about the defendant's motivations, Cruz testified about how members of the Castle Hill Crew bragged about how the defendant had "put in work" in a park in 2017. (Tr. at 611-612). As a result of the defendant's actions, the defendant's status in the Castle Hill Crew rose and he "became somebody" and "had more status than most of the people that was in the gang." (Tr. at 612).

The defendant argues that the jury could not have found that the April 27, 2017 shooting happened (and therefore could not have found that retaliation was the defendant's motive for the Story Playground Shooting) because there was no ShotSpotter evidence to corroborate Arroyo's testimony. (Mot. at 8-9). But the absence of ShotSpotter evidence is hardly conclusive. Walter

11

Collier, the ShotSpotter expert witness, testified that ShotSpotter captures much—but not all—detectable outdoor gunfire. (Tr. at 205). He explained that this is because of environmental factors that may affect sound propagation between the gun and the ShotSpotter sensors. (Tr. at 189). As a result, the jury was free to credit Angel Arroyo's testimony about the April 27, 2017 shooting, despite the absence of a ShotSpotter report. *See United States v. Jones*, 482 F.3d 60, 68 (2d Cir. 2006) (explaining that courts must defer to the "jury's evaluation of the credibility of witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence"); *United States v. Florez*, 447 F.3d 145, 156 (2d Cir. 2006) ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge.").

In any event, the jury was not required to find that the April 27, 2017 shooting occurred to find that the defendant committed the Story Playground Shooting in connection with his membership in the Castle Hill Crew. Based on the overwhelming evidence described above, the jury could have easily inferred that the defendant shot at members of the Monroe Crew in a playground directly adjacent to the Monroe Houses as part of the ongoing back-and-forth violence between the Castle Hill Crew and the Monroe Crew that had been going on for years. Based on this overwhelming evidence, it was entirely reasonable for the jury to conclude that one of the purposes for the defendant's commission of the Story Playground Shooting was to increase or maintain his status within the Castle Hill Crew. *See United States v. Farmer*, 583 F.3d 131, 143-44 (2d Cir. 2009) ("The government was not required to prove that [defendant's] sole or principal motive was maintaining or increasing his position, so long as it proved that enhancement of status was among his purposes." (internal quotation marks and citation omitted)).

Finally, the defendant's argument that the jury should have discounted all of the evidence detailed above based on hearsay from the victim's mother borders on the frivolous. (Mot at 9).

The Court instructed the jury on multiple occasions that this hearsay evidence could not be considered for the truth of the matter asserted.  (Tr. at 147, 892).  In other words, the jury was barred from using this testimony as proof of the motivation for the shooting, given that the hearsay was clearly based on out-of-court rumors and conversations with other people in the neighborhood. *See* Fed. R. Evid. 801(c).  In any event, there is no reason why the mother of an innocent bystander would know why a particular shooting occurred.  Rather, the jury was free to credit the testimony from Arroyo and Cruz—witnesses who had personal experience with the Castle Hill Crew and the violent conflict between the Castle Hill Crew and the Monroe Crew.  In sum, there was ample evidence for the jury to reasonably find that the defendant committed the Story Playground Shooting and that he did so to increase or maintain his position in the Castle Hill Crew.

## II.     The Defendant's Motion for a New Trial Should Be Denied.

The defendant's motion for a new trial based on the Court's handling of jury notes and the failure to explicitly question the venire regarding implicit bias should also be denied.

### A.     Applicable Law

Federal Rule of Criminal Procedure 33(a) states: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Although granting such a motion is in the court's discretion, "that discretion should be exercised sparingly." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).  "Motions for a new trial are disfavored in [the Second] Circuit . . . ." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).  "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice . . . . There must be a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotations marks and citation omitted).

### B.      Discussion

#### 1.   The Manner in which the Court Responded to Jury Notes Does Not Warrant a New Trial.

Because the Court's responses to the four jury notes did not create any reasonable possibility of prejudice, the defendant's motion for a new trial should be denied.

A defendant in a criminal case has the right to be present at "every trial stage," Fed. R. Crim. P. 43(a)(2), which "has been extended to require that messages from a jury should be disclosed to counsel and that counsel should be afforded an opportunity to be heard before the trial judge responds." *United States v. Mejia*, 356 F.3d 470, 474 (2d Cir. 2004) (internal quotation marks omitted).  The Second Circuit has articulated a four-part practice for responding to jury inquiries: "(1) the jury inquiry should be in writing; (2) the note should be marked as the court's exhibit and read into the record with counsel and defendant present; (3) counsel should have an opportunity to suggest a response, and the judge should inform counsel of the response to be given; and (4) on the recall of the jury, the trial judge should read the note into the record, allowing an opportunity to the jury to correct the inquiry or to elaborate upon it." *Id.* at 475.  Importantly, however, this process is aimed at avoiding a situation where "*ex parte* communication between the judge and a member of the jury may unintentionally 'drift' into a supplemental instruction" or "generate unintended and misleading impressions of the judge's subjective personal views." *United States v. Collins*, 665 F.3d 454, 459–60 (2d Cir. 2012) (internal citations omitted).  Because those concerns are in no way implicated by the jury notes in this case, and because the manner in which the notes were responded to by the Court did not create "any reasonable possibility of prejudice," *see Morris v. United States*, 523 F. App'x 7, 9 (2d Cir. 2013), the defendant's motion should be denied.

In the first jury note, a juror asked about the surveillance video from the defendant's apartment building on the day of the Story Playground Shooting.  (CX 5).  The note was marked as a court exhibit and shown to counsel for the Government and to counsel for the defendant.  (Tr. at 363-364).  The parties jointly proposed a response to the Court, which the Court then provided orally to the jury, in open court.  (Tr. at 428-429, 433).  The Court fully complied with the procedure set out in *Mejia*, and the defendant does not appear to argue otherwise.

In the second note, a juror requested that he/she be permitted to pick up a personal item over the lunch break.  (CX 7).  The note was marked as a court exhibit.  *Id.*  Although this note was not shared with the parties, it in no way related to the substance of the case or to the juror's ability to hear and see the evidence presented during trial hours.  The defendant has not argued that this communication touched upon the merits of the case whatsoever.  Nor, on this record, could he.  The wording of Court's response "was not significant" and "in no way guided the jury's verdict."  *Morris*, 523 F. App'x at 9.  At most, the communication concerned an administrative matter totally unrelated to the merits of the case.  *See United States v. Ballistrea*, 101 F.3d 827, 837 (2d Cir. 1996) (no reversible error when episode "largely concerned administrative matters").  Accordingly, there was no prejudice to the defendant.

In the third note, the jury asked for additional copies of the jury charge.  (CX 10).  The note was marked as a court exhibit.  *Id.*  The Court provided the jury with the requested copies, and the defendant does not claim that the Court erred in doing so.  (Mot. at 11).

In the fourth note, sent to the Court simultaneously with the jury's verdict, the jury indicated a concern for their safety at the time the verdict was announced and asked whether there were protocols in place to ensure their safety.  (CX 12; Tr. at 988).  The note was marked as a court exhibit and shown to counsel for the Government and to counsel for the defendant.  (CX 12;

Tr. at 988).  The Court told the parties that it did not intend to respond to the note but that it had arranged for additional security in the courtroom.  (Tr. at 988).  No party objected.  (*Id.*).  Because the Court did not respond directly to the jury's note and because, in any event, the note accompanied the verdict, the Court's actions could not have "guided the jury's verdict" and therefore could not have prejudiced the defendant.  *Morris*, 523 F. App'x at 9.

Finally, the defendant complains that the fact of the jury having reached a verdict was communicated to the Court by a court security officer and not by written note.  The defendant cites no cases for the proposition that this was in any way improper, nor makes any argument regarding how the procedure could have in any way influenced the verdict.  (Mot. at 11).

Because the manner in which the notes were responded to by the Court did not create "any reasonable possibility of prejudice," *Morris*, 523 F. App'x at 9, and ultimately do not raise "a real concern that an innocent person may have been convicted," *Canova*, 412 F.3d at 349, the defendant's motion for a new trial on the basis of the jury notes should be denied.

### 2.    The Defendant Was Convicted by an Impartial Jury

The defendant was convicted by an impartial jury, and his arguments to the contrary— unsupported by the law or the facts—should be rejected.

Under the Fifth and Sixth Amendments of the Constitution, a criminal defendant has the right to be tried by an impartial jury.  U.S. Const. amend VI; *United States v. Parse*, 789 F.3d 83, 110–11 (2d Cir. 2015).  "An impartial jury is one in which all of its members . . . are free of interest and bias."  *Id.*  "The voir dire of prospective jurors, who have been placed under oath, is an important method of protecting a defendant's right to trial by jurors who are impartial."  *Id.* (internal quotations omitted).

It is well settled that "[v]oir dire is necessarily a matter in which the trial court has extremely broad discretion."  *United States v. Diaz*, 854 F. App'x 386, 388 (2d Cir. 2021)

(summary order) (quoting *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002)).  "[T]here is no per se constitutional rule . . . requiring inquiry as to racial prejudice [during voir dire]."  *Id.* (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 190 (1981) (plurality opinion)).  Instead, "[o]nly when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion."  *Id.*

Apart from the requirements of the Sixth Amendment, the Supreme Court has indicated that district courts generally should question prospective jurors about racial prejudice in any instance where a criminal defendant requests such questioning.  *Id.*  However, failure to do so is reversible error "only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury."  *Id.* (quoting *Rosales-Lopez*, 451 U.S. at 191).

The defendant has failed to meet either of these standards.  The defendant points to *no evidence* that racial or ethnic prejudice affected the jurors in the case, let alone "a reasonable possibility" or even "substantial indications of the likelihood of" such prejudice.  *Id.*  While it is true that the jury asked about their safety at the time the verdict was returned, that is naturally explained by the violent nature of the conduct on trial—shootings, stabbings, and possession of loaded firearms—not by racial prejudice.

The defendant also complains that his co-conspirator and fellow Castle Hill Crew member, Marvin Ortega, was identified in the courtroom gallery by Arroyo during Arroyo's testimony. (Mot. at 12-13).  There was nothing improper, and certainly nothing race-related, about this testimony.  In the context of indicating whether he recognized anyone in the courtroom, Arroyo

identified Ortega (and then subsequently the defendant).  (Tr. at 250-51).  While the defendant insists that Ortega is a "childhood friend" who "is gainfully employed," (Mot. at 12), Ortega also personally participated with the defendant in the brutal stabbing of Arroyo that left Arroyo with numerous stab wounds to his head and back and required several staples to close, (Tr. at 324-327; GX 601).  Ortega may have been at the trial to support his friend, he may have been there to support a fellow gang member, or he may have been there as implicit intimidation of cooperating witnesses.  Whatever Ortega's reasons for attending the trial, Arroyo's identification of him was relevant to establishing Ortega's relationship with the defendant.  The identification of Ortega in the courtroom also corroborated testimony and social media evidence proving the existence of the Castle Hill Crew, the defendant's membership in that enterprise, and the willingness of the defendant and other members of the gang to use violence and intimidation.

In any event, the Court *did* screen potential jurors for racial bias during voir dire and then specifically instructed the final jury panel regarding racial bias, including implicit bias, during the jury charge.

The Court's voir dire specifically included a question asking whether there was any reason that a potential juror "would be unable to sit as a fair and impartial juror in this case and render a true and just verdict without fear, favor, sympathy, *or prejudice* in accordance with the law . . . ." (CX 1 at ¶ 31 (emphasis added)).  The venire clearly understood the import of this question because one potential juror identified himself as "prejudiced" in response to that question and was excused. (9/13/21 Tr. at 150, 155).  If the defense found the Court's voir dire insufficient, this is the first they have said so.  Prior to voir dire, the Court provided to all parties a copy of its proposed questions.  (CX 1-2; 9/10 Tr. at 14; 9/13 Tr. at 69-70).  At no time did the defense object to the Court's proposed questioning.  Likewise, at no point during voir dire—which lasted an entire

day—did the defense ask for further examination of any juror regarding racial prejudice or bias.

Moreover, at the conclusion of voir dire, when the Court specifically inquired whether "the jury

[was] acceptable to the defendant," defense counsel answered "yes."  (9/13/21 Tr. at 183).

Later, after presentation of the evidence, the Court again instructed the jury panel regarding

the impropriety of deciding the case based on prejudice or bias, including implicit bias:

> Your verdict must be based solely upon the evidence developed at trial or the lack of evidence. The parties in this case are entitled to a trial free from prejudice about a party's race, religion, national origin, sex or age. Our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence. You must resist jumping to any conclusions in favor or against a witness or party based upon unconscious or implicit bias. Unconscious or implicit biases are stereotypes, attitudes, or preferences that we have that can affect how we evaluate information and make decisions. Your verdict must be based on the evidence or lack of evidence and the Court's instructions on the law. Similarly, under your oath as jurors you are not to be swayed by sympathy. Once you let fear, prejudice, bias, or sympathy interfere with your thinking, there is a risk that you will not arrive at a just and true verdict. Your verdict must be based exclusively on the evidence or the lack of evidence in the case.

(Tr. at 924-925).

As the Second Circuit has made clear, "federal trial judges are not required to ask every

question that counsel—even all counsel—believes is appropriate." *Diaz*, 854 F. App'x at 389

(quotations omitted).  Indeed, the Second Circuit has "never . . . reversed a conviction for the

failure to ask a particular question on the voir dire of prospective jurors." *Id.* (quotations omitted);

*see also United States v. Treacy*, 639 F.3d 32, 46 (2d Cir. 2011) (same).  Thus, while the Court

may not have used the precise wording proposed by the defense, through its voir dire and then its

final instructions, the Court adequately ensured that the jury's verdict was not influenced by racial

prejudice or bias.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion should be denied in its entirety.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

By:           /s/
                 Andrew K. Chan
Celia V. Cohen
Emily A. Johnson
Assistant United States Attorneys
Tel.:  (212) 637-1072 / 2466 / 2409