UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

                                                    20-cr-603 (PKC)

            -against-                               OPINION
                                                    AND ORDER

NICHOLAS JOSEPH,

                        Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

            Defendant Nicholas Joseph moves for a partial judgment of acquittal and a new

trial pursuant to Rules 29 and 33, Fed. R. Crim. P.  For the reasons that will be explained, the

motion is denied.

            A five-count S2 indictment charged Joseph with participating in a racketeering

conspiracy in violation of 18 U.S.C. § 1962(d); attempted murder and assault with a dangerous

weapon in aid of racketeering, in violation of 18 U.S.C. § 1959; using and carrying a firearm,

which was discharged, in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c);

and two counts of being a felon in possession of firearms and ammunition, in violation of 18

U.S.C. §§ 922(g).  (Docket # 33.)

            Joseph's trial commenced on September 13, 2021.  At trial, the government

endeavored to prove that Joseph was a member of the Castle Hill Crew, a criminal enterprise

based in the Soundview neighborhood of the Bronx, and that on April 28, 2017, Joseph

discharged a firearm at the neighborhood's Story Playground, causing a 12-year-old boy to be

shot in the hip.  The government argued to the jury that the April 28 shooting was an act of

retaliation for an unsuccessful attempt to attack Joseph that occurred on the day prior.

On September 22, 2021, the jury returned a verdict of guilty on all five counts. (Docket # 69.)  Joseph now moves under Rule 29 for a judgment of acquittal as to Count Two and Count Three.  In the alternative, he moves for a new trial pursuant to Rule 33.

## I.   Joseph's Rule 29 Motion for Judgment of Acquittal Will Be Denied.

Rule 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  In reviewing a Rule 29 motion, the court "must view the evidence in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government."  United States v. Anderson, 747 F.3d 51, 60 (2d Cir. 2014) (internal quotation marks omitted). "The jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation."  United States v. Pugh, 945 F.3d 9, 19 (2d Cir. 2019) (quotation marks omitted).   A court must "defer[ ] to the jury's evaluation of the credibility of witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence."  United States v. Jones, 482 F.3d 60, 68 (2d Cir. 2006); United States v. Florez, 447 F.3d 145, 156 (2d Cir. 2006) ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge."). The motion must be denied if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see also United States v. Cuti, 720 F.3d 453, 461 (2d Cir. 2013) (a verdict should be disturbed only where "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.").

Count Two of the S2 Indictment charged Joseph with a violent crime in aid of racketeering, 18 U.S.C. § 1959(a).  "To convict the defendant of a violent crime in aid of racketeering, the government was obliged to prove five elements: '(1) that the Organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise.'"  United States v. White, 7 F.4th 90, 101 (2d Cir. 2021) (quoting United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992)).  The fifth element is satisfied "if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.  The government need not prove that maintaining or increasing the defendant's position in the RICO enterprise was his sole or principal motive."  Id. (quotation marks and citations omitted); see also United States v. Farmer, 583 F.3d 131, 143-44 (2d Cir. 2009) ("The government was not required to prove that Farmer's sole or principal motive was maintaining or increasing his position, so long as it proved that enhancement of status was among his purposes.") (quotation marks and citation omitted).

At trial, the government adduced evidence about the existence of a criminal organization referred to as the "Castle Hill Crew."  Witness testimony and trial exhibits described the Castle Hill Crew as a gang based in and around the Castle Hill Houses in the Soundview neighborhood of the Bronx, whose criminal purpose included drug sales and bank-fraud schemes.  (See, e.g., Tr. 307-08, 375-76, 546, 548, 559, 589-91, 599-600, 656, 548-49, 656.)  The government introduced into evidence multiple photographs and videos that showed Joseph alongside members of the Castle Hill Crew, as well as social media posts touting his

membership in the Castle Hill Crew and photos of Joseph's crew-related tattoos.  (See, e.g., GX 308A, 308B, 309A, 309B, 309F, 310-13, 315, 315A, 317F, 503-3, 503-26, 730C, 503-4, 503-39, 705.)

Witness testimony described a violent rivalry between the Castle Hill Crew and the "Monroe Crew," which was based out of the nearby James Monroe Houses.  (See, e.g., Trial Tr. 245-46, 554-55.)  Angel Arroyo, a cooperating witness formerly affiliated with the Monroe Crew, testified that members of the Castle Hill Crew and the Monroe Crew were expected to commit acts of violence when they encountered one another – an expectation colloquially known as "putting in work, "spinning," and "earning your stripes."  (Tr. 247-48.)  Arroyo testified that examples of "putting in work" including "[s]tabbings, shootings, smashing."  (Tr. 247.)  Christopher Cruz of the Castle Hill Crew testified that putting in work "could mean anywhere from selling drugs to hurting somebody.  . . .  The more work you put in the higher up you are.  . . . Meaning like, statuswise, you could just control what you need to control."  (Tr. 553.)  Cruz testified that if a rival gang committed violence against the Castle Hill Crew, "Whatever they did, you want to do ten times worse," and that if a member of the Monroe Crew attacked someone from Castle Hill Crew, the expectation was to "[g]o back and shoot."  (Tr. 554.)

The crimes charged in Count Two and Count Three relate to the discharge of a firearm that resulted in a bullet striking a twelve-year-old boy at the Story Playground in the Soundview neighborhood of the Bronx.  Count Two charged Joseph with violent crime in aid of racketeering for the purpose of maintaining and increasing his position in the Castle Hill Crew. (S2 Indictment ¶ 10.)  Count Three charged Joseph with carrying, possessing, brandishing and discharging a firearm in connection with the violent crime charged in Count Two.  (S2 Indictment ¶ 11.)

At trial, Arroyo testified about an incident of April 27, 2017 in which a member of the Monroe Crew attempted to shoot Joseph and another member of the Castle Hill Crew using a .32 revolver.[1]  (Tr. 335-37, 346-50.)  Arroyo testified that on that date, he was selling drugs outside of the Monroe Houses when he handed a gun to a fellow Monroe Crew member named "Willy."  (Tr. 335-37, 343.)  Arroyo then observed a conversation between Willy, Joseph and others from the two rival crews.  (Tr. 346-48.)  Following the interaction, a person named "Nasir" expressed anger toward Willy because Willy failed to shoot the Castle Hill Crew members.  (Tr. 347.)  Nasir then took the gun and went toward the area where Joseph and another Castle Hill Crew member were believed to be, after which Arroyo heard a gunshot.  (Tr. 348.)  Arroyo did not observe the gun being discharged, but he then saw Joseph and another Castle Hill Crew member run in one direction and Nasir run in the other.  (Tr. 348-49.)

Arroyo testified that the next day, on April 28, 2017, Arroyo was again outside the Monroe Houses when he observed fellow Monroe Crew members Nasir and "Latief" walking toward the nearby Story Playground.  (Tr. 350-51.)  Nasir and Latief told Arroyo that they were going to sell drugs to a buyer in a private apartment complex where Joseph happened to live.  (Tr. 153, 167, 217, 351.)  A few minutes later, Arroyo heard three or four gunshots from the direction of the apartment complex.  (Tr. 351-52.)  Latief and Nasir ran toward Arroyo and told him that Joseph had shot at them in the Story Playground basketball courts.  (Tr. 352-55.)

ShotSpotter, which is a system of sensors used to geolocate gunfire, detected three shots fired at or near 820 Thierot Avenue, the address of the apartment building where Joseph resided, on April 28, 2017 between 5:09:31 p.m. and 5:09:40 p.m.  (GX 1000; Tr. 167.)  Surveillance video from the lobby of 820 Thierot Avenue showed an individual who appeared to

---

[1] Though the Court will refer to the defendant by his given name, witnesses throughout the trial referred to Joseph by the nickname "Gotti."

be Joseph lingering in and around the lobby with two other individuals at approximately 5:07 p.m. (GX 301.) A video taken from the building exterior appeared to show Joseph walking toward the Story Playground, then returning at a sprint, at which point he retrieved from an accomplice an object that appeared to be a gun. (GX 302.) The video showed Joseph running from the front door of 820 Thierot toward Story Playground at 5:09:21 p.m., with the apparent gun in hand, and disappearing from view at 5:09:26. (GX 302.) During this timeframe, a 12-year-old boy in the Story Playground was shot in the hip. (Tr. 143; GX 602.) The surveillance video showed Joseph's associates returning to the lobby, but not Joseph. (GX 301.)

Cruz testified that members of the Castle Hill Crew later discussed that Joseph had "put in work" for Castle Hill at a park in 2017. (Tr. 611-12.) Cruz testified that Joseph then "became somebody" and "had more status than most of the people that was in the gang." (Tr. 612.) The government adduced evidence of the search history from Joseph's cellphone from December 2020, including searches for news stories about the Story Playground shooting and the victim's name. (Tr. 845-51; GX 507, 508.)

Joseph urges that his motion for a judgment of acquittal should be granted because no eye witness testified that they observed him discharge the firearm at the playground shooting of April 28, 2017. However, there was direct and circumstantial evidence that Joseph was the playground shooter, including the lobby surveillance video taken from Joseph's apartment building at 820 Thierot Avenue. Further, Arroyo testified that his fellow Monroe Crew members Nasir and Latief ran from the Story Playground and told him that Joseph had shot at them. (Tr. 353-54.) Those statements were admitted as excited utterances and present-sense impression exceptions to the hearsay rule. Fed. R. Evid. 803(1), (2). ShotSpotter evidence also indicated that three shots were fired from the area near 820 Thierot Avenue and the Story

Playground at a point in time that coincided with the lobby surveillance footage.  (Tr. 194-95; GX 1000.)  A rational trier of fact weighing this evidence could conclude that the surveillance video depicted Joseph leaving for Story Playground while carrying a firearm and credit the ShotSpotter evidence that three shots were fired at or around the same time, and conclude that Joseph was the person who discharged the firearm at the Story Playground.  See Cuti, 720 F.3d at 461.  A rational trier of fact also could credit Arroyo's testimony about the statements of Nasir and Latief.  See id.  That no eye witness testified that he or she observed Joseph discharge the firearm does not warrant Rule 29 relief.

Joseph's remaining arguments go toward whether there was sufficient evidence that the shooting was carried out in aid of the Castle Hill Crew racketeering conspiracy.  As noted, one element under 18 U.S.C. § 1959(a) is proof that the defendant committed a crime of violence and "that his general purpose in so doing was to maintain or increase his position in the enterprise."  White, 7 F.4th at 101; see also Farmer, 583 F.3d at 143-44.

Joseph urges that the government did not sufficiently prove that he was involved in an altercation on April 27, thereby defeating any evidence that the April 28 playground shooting was motivated by retaliation.  Joseph notes that the parties stipulated that the ShotSpotter array at the Monroe Houses did not pick up any shot fired on April 27, 2017.  (DX Z.)  He also notes that no witness other than Arroyo testified about observing an April 27 shooting at the Monroe Houses.  Thus, Joseph urges, a rational trier of fact could not conclude that the shooting of April 28 was carried out in retaliation for the incident of April 27.

At trial, the government called as a witness Walter Collier III, who was qualified as an expert in the forensic analysis of ShotSpotter data.  (Tr. 190.)  Collier testified that ShotSpotter detects approximately 90% of outdoor gunfire.  (Tr. 205.)  He testified that "many"

factors can prevent gunfire detection, including when a weapon is fired downward. (Tr. 189.) A
rational trier of fact could weigh the absence of ShotSpotter data alongside the testimony of
Arroyo, and credit Arroyo's testimony that he observed Nasir pursue Joseph with a gun and then
heard the gun's discharge. See Jones, 482 F.3d at 68 (a court must "defer[ ] to the jury's
evaluation of the credibility of witnesses, its choices between permissible inferences, and its
assessment of the weight of the evidence.").

       In addition to Arroyo's testimony about the events of April 27, the jury also was
entitled to weigh and credit evidence of the ongoing acts of violence and retribution between
members of the Monroe Crew and Castle Hill Crew, as described in the testimony of Arroyo and
Cruz and shown in trial exhibits. (Tr. 316-37; 554-55; GX 311.) A rational trier of fact could
conclude that Joseph discharged the firearm at the Story Playground in order to increase or
maintain his status in the Castle Hill Crew, even if it was not in direct retribution for an incident
on April 27.

       Lastly, Joseph urges that Rule 29 relief is warranted because the mother of the 12-
year-old victim testified at trial that she had heard that the April 28 shooting was motivated by a
personal dispute over a girlfriend. (Tr. 147.) At trial, defense counsel asked, "And do you recall
whether or not you said at one of those meetings -- at both of those meetings -- that the reason
for the shooting was about a girlfriend?" (Tr. 147.) The government objected to the question on
hearsay grounds. (Tr. 147.) Before the Court ruled on the objection, the witness stated, "I said it
was a rumor, because neighborhood talk, so that's what I heard." (Tr. 147.) The government re-
stated its objection, and the Court stated, "Yes. I understand. It's not admitted for the truth of its
contents, but the fact that it was said." (Tr. 147.) When defense counsel later referred to this
testimony in closing summations, the Court again instructed the jury that the statement was not

to be considered for the truth of its contents.  (Tr. 891-92.)[2]  Defense counsel confirmed that he was referencing the testimony "for a limited purpose" and not for its truth.  (Tr. 892.)  In view of the overwhelming evidence that "putting in work" was a means of advancing within the Castle Hill Crew, the statement in the course of interviews that the shooting was motivated by a personal dispute involving a girlfriend does not warrant a judgment of acquittal under Rule 29.

Joseph's motion for a judgment of acquittal as to Counts Two and Three under Rule 29 will therefore be denied.

II.     Defendant's Rule 33 Motion for a New Trial Will Be Denied.

A.  Legal Standard.

In the alternative, Joseph moves for a new trial under Rule 33(a), which provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  "'Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence must be assumed, that discretion should be exercised sparingly' and only in the most extraordinary circumstances."  United States v. Landesman, 17 F.4th 298, 330 (2d Cir. 2021) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)).  "'In evaluating a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation, keeping in mind that the ultimate test for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'"  Id. (quoting United States v. Alston, 899 F.3d 135, 146 (2d Cir. 2018)).  While a court may weigh evidence and witness credibility, it must not usurp the jury's role.  Id.

---

[2] No objection was made by the defense at the time of the witness's testimony or in summation to the Court's limiting instruction.  No claim is made in the post-verdict motion as to the limitation on the jury's consideration of the witness's affirmative response.

Rule 33 relief may be appropriate where the evidence weighs so heavily against the verdict "'that it would be manifest injustice to let the verdict stand.'" Id. (quoting United States v. Archer, 977 F.3d 181, 188 (2d Cir. 2020)).

> B.  Jury Notes.

Joseph urges that he is entitled to a new trial because the Court's handling of juror notes did not comply with the four-part procedure described in United States v. Collins, 665 F.3d 454, 459-60 (2d Cir. 2012).  A criminal defendant's right to be present at trial is based on the Fifth Amendment's due process clause and the Sixth Amendment's confrontation clause, and Rule 43(a)(2) provides that a defendant has the right to be present at "every stage of trial." Collins, 665 F.3d at 459.  This right applies to a court's review and response to juror notes.  Id. The Second Circuit has articulated the "proper practice" for handling jury notes: "'(1) the jury inquiry should be in writing; (2) the note should be marked as the court's exhibit and read into the record with counsel and defendant present; (3) counsel should have an opportunity to suggest a response, and the judge should inform counsel of the response to be given; and (4) on the recall of the jury, the trial judge should read the note into the record, allowing an opportunity to the jury to correct the inquiry or to elaborate upon it.'"  Id. at 460 (quoting United States v. Mejia, 356 F.3d 470, 475 (2d Cir. 2004)).  This process "reduces the risk that the trial court will respond in a way that prejudices one side" and avoids ex parte communications between the judge and any juror that "may unintentionally 'drift' into a supplemental instruction" outside the presence of the defendant.  Id.[3]  In Collins, the trial judge held an ex parte interview with a juror without first sharing the contents of the juror's note or seeking counsel's input.  Id. at 458-59.

---

[3] There is a distinction between the holding of Collins and other cases involving a defendant's right to be present during the handling of jury notes and the Circuit's helpful guidance, originating in its decision in United States v. Ronder, 639 F.2d 931, 933 (2d Cir. 1981).  Judicial practice has evolved since 1981, such that in responding to a

In one juror note, which was marked as Court Exhibit 7, a juror requested permission to retrieve a work-related item from a colleague during a lunch break, stating in part, "I request permission to either step out to pick up this item or to have my teammate step in to the courthouse to hand it over to me." Joseph observes that the Court did not raise the contents of the note with counsel or allow them the opportunity to comment on a proposed response. However, on the record and in the presence of counsel and the defendant, the Court stated, "I know Juror 3 has a request about picking up a package on Saturday -- on Monday during the lunch break. We'll make that happen. You can step out and pick up the package. You'll work with [the deputy clerk] and the CSOs. You can step out and you can bring it back into the courthouse. If there's a problem, I'll be around." (Tr. 620.) The jury then left the courtroom, at which point the Court heard from counsel on an evidentiary dispute. (Tr. 622-25.) Counsel had the opportunity to propose an immediate correction or clarification of the Court's response if they thought one was warranted. Joseph's Rule 33 motion does not now claim prejudice or unfairness in the Court's response or its failure to follow the four-step Collins process, nor does it explain why the Court's response would entitle him to a new trial under Rule 33(a).

Another note, which was marked as Court Exhibit 12, was sent by the jury at the conclusion of deliberations but before the verdict was taken, and was contained in an envelope marked "question." The Court discussed the note on the record at a sidebar with counsel:

But I did open the one that [reads] "question". And it's dated 12:35 today and it says:

---

jury note a formal "recall of the jury" into the courtroom is neither sought by either side nor required under the circumstances. For example, there are occasions after reading and marking a jury note where the Court will confer with counsel in the presence of the defendant and arrive at a response that is typed, marked as a Court exhibit and delivered to the jury room. Similarly, a jury request for a read-back is often dealt with in consultation with both sides by the preparation of an edited transcript (redacted to eliminate sidebars and other extraneous matter) that is then delivered to the jury room. Respectfully, the Court does not consider these practices to run afoul of any holding from the Circuit.

"Some of us are concerned for our safety after the verdict is announced. Are there any protocols that would ensure our safety or can that be addressed?"

Just want you to know that that note came in and that what I'm doing is I don't plan to orally say anything but I've called down to see if we could get some extra CSOs who would be able to escort our jurors out. Everybody's entitled to know. So, you know what I know.

Thank you.

(Tr. 988.) While the note was shown to counsel for each side and marked as Court Exhibit 12, Joseph points out that it was not read aloud in open court. The assertion is true so far as it goes. But the sidebar was in the courtroom and the Court never barred defendant from attendance at sidebars or requesting such attendance. He also claims that the issue was not "directly addressed by the trial court." (Def. Mem. at 11.) The Court addressed the note by advising counsel that it did not plan to say anything to the jury but would arrange additional security upon the return of the verdict. Joseph does not identify any prejudice related to the Court's handling of Court Exhibit 12. Counsel had the opportunity to object to the Court's proposed handling of the note and did not do so. Joseph does not explain why the response to this note entitles him to a new trial under Rule 33(a).

Lastly, Joseph observes that the jury did not explicitly state in a note that it had reached a verdict. (Def. Mem. at 11.) Instead, the jury submitted an envelope labeled "verdict," which contained a completed verdict form. (See Tr. 988.) Joseph does not cite to any authority or offer a rationale as to why a jury note is required to announce that a verdict has been reached, nor does he explained how he was prejudiced by the absence of such a note.

Joseph's motion for a new trial based on the Court's responses to the jury notes will be denied.

C.  <u>Questioning about Unconscious or Implicit Bias During Voir Dire.</u>

Joseph urges that a new trial is warranted because during voir dire, the Court did not question or instruct jurors about their unconscious or implicit racial bias, in violation of Joseph's right to a fair trial under the Sixth Amendment.  Joseph notes that the risks of implicit bias were heightened in his case because he is an African American and the purported members of the Castle Hill Crew were all either African American or Latino.  Joseph also notes that there were no African Americans on the jury.

The Fifth and Sixth Amendments guarantee a criminal defendant the right to be tried before an impartial jury, which includes a jury free of bias.  <u>See</u>, <u>e.g.</u>, <u>United States v. Parse</u>, 789 F.3d 83, 111 (2d Cir. 2015).  There is no <u>per</u> <u>se</u> constitutional rule that requires an inquiry about racial prejudice during voir dire, although a court must inquire if there are "substantial indications" of likely racial or ethnic prejudice affecting jurors in a particular case.  <u>United States v. Diaz</u>, 854 Fed. App'x 386, 388 (2d Cir 2021) (summary order) (citing <u>Rosales-Lopez v. United States</u>, 451 U.S. 182, 190 (1981)).

Prior to trial, Joseph proposed a preliminary instruction that would have defined an unconscious or implicit bias as "stereotypes, attitudes, or preferences that we express without conscious awareness, control, or intention.  Like conscious bias, unconscious/implicit bias, too, can affect how we evaluate information and make decisions."  (Docket # 48.)  The Court's closing charge included an instruction about unconscious or implicit bias: "You must resist jumping to any conclusions in favor or against a witness or party based upon unconscious or implicit bias.  Unconscious or implicit biases are stereotypes, attitudes, or preferences that we have that can affect how we evaluate information and make decisions.  Your verdict must be based on the evidence or lack of evidence and the Court's instructions on the law."  (Tr. 925.)

The jury was required to follow all of the Court's instructions and Joseph does not explain how he was prejudiced by its inclusion in the final instructions rather than the preliminary instructions.

Joseph also complains that questions to jurors in voir dire did not raise the issue of implicit bias. Prior to voir dire, the Court distributed copies of its proposed questions to jurors and Joseph made no objection.[4] (Court Exhibits 1, 2; 9/8/21 Tr. at 3; 9/10/21 Tr. at 14.)

While its questions to jurors did not expressly refer to implicit or unconscious bias, the Court questioned potential jurors about the issue of prejudice, and asked whether there was any reason a potential juror "would be unable to sit as a fair and impartial juror in this case and render a true and just verdict without fear, favor, sympathy, or prejudice in accordance with the law . . . ." (Court Exhibit 2 ¶ 31.) One potential juror claimed an inability to be impartial due to prejudice. (Voir Dire Tr. 150.)

Rule 33(a) relief is not warranted based on the absence of any question about implicit or unconscious bias during voir dire. The Court questioned potential jurors about the issue of prejudice. Moreover, the Court's closing charge cautioned jurors about the potential risk of unconscious or implicit biases in deliberations and instructed them that their verdict must be based on the evidence and the Court's instructions. (Tr. 925.)

Joseph's motion for a new trial directed toward the questioning of jurors about unconscious bias will be denied.

D.  Witness Identification of "Marvin" in the Courtroom Gallery.

Lastly, Joseph notes that during trial, the government elicited testimony from Arroyo that a purported member of the Castle Hill Crew was seated in the gallery of the

---

[4] Both the government and defense counsel proposed revisions to the list of places and persons expected to be at issue in the trial but they raised no objection to the questions to jurors. (9/8/21 Tr. at 51-52; Tr. 69-70.)

courtroom.  (Tr. 250.)  The government asked Arroyo if he recognized anyone in the courtroom, and Arroyo pointed out a member of the public in the gallery who he identified as "Marvin from Castle Hill." (Tr. 250.)  Arroyo also identified Joseph.  (Tr. 251.)  Joseph urges that the identification of Marvin was "gratuitous and unnecessary" and "highly prejudicial." (Def. Mem. 12.)  Marvin's image appeared in several government exhibits, and Arroyo later testified that Marvin and Joseph had once chased him down and stabbed him.  (Tr. 324-27.)  Joseph asserts that Arroyo's identification of Marvin caused the jurors to fear for their safety after the verdict, and that Marvin was present merely as a good-faith attempt to show support for his friend Joseph.  (Def. Mem. 12-13.)  Joseph urges that Arroyo's identification of Marvin underscores the need to include a question to jurors about implicit bias.

Joseph has not demonstrated unfair prejudice based on Arroyo's identification of Marvin, nor has he plausibly explained how the identification placed racial bias at issue.  Arroyo identified Marvin in response to questions that appeared to have been intended to elicit Arroyo's identification of Joseph.  Several images depicting Marvin with Joseph were received into evidence and Arroyo also testified about Marvin's participation in a violent attack against him. Joseph has not persuasively explained how Arroyo's identification of Marvin affected his right to a fair trial or otherwise touched on the issue of implicit or unconscious bias.

Joseph's motion for a new trial directed toward Arroyo's identification of Marvin will be denied.

CONCLUSION.

For the reasons explained, Joseph's motion for relief under Rules 29 and 33 is DENIED.  (Docket # 90.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       February 4, 2022